Argued 18 February; decided 17 March, 1902.

## LARCH MOUNTAIN INVEST. CO. *v.* GARBADE.

[68 Pac. 6.]

ESTOPPEL.

1. One who has, with knowledge of the surrounding circumstances, deliberately assumed a particular position, must act consistently, and will not be permitted to change his position to the prejudice of others who, to his knowledge, have relied on his conduct in protecting their rights.[*]

WAIVING OBJECTION TO EQUITABLE JURISDICTION.

2. An objection to the jurisdiction on the ground that plaintiff's remedy is at law, and not in equity, not made in the court below, is waived: *Municipal Sec. Co.* v. *Baker County,* 33 Or. 338, followed.

APPEAL—CONCLUSIVENESS OF FINDINGS.

3. In deciding an equity case it is the duty of the Supreme Court of Oregon, under Section 543 of Hill's Ann. Laws, to reach its conclusions by original investigation, and the findings of the trial court are only advisory, though they may be persuasive: *Nessley* v. *Ladd,* 29 Or. 354, approved; *Willis* v. *Smith,* 36 Or. 601, and *Browning* v. *Lewis,* 39 Or. 11, explained.

From Multnomah: JOHN B. CLELAND, Judge.

This is a suit by the Larch Mountain Investment Co., to determine the ownership of $2,271.21, deposited by the plaintiff with the sheriff of Multnomah County, for the purpose of redeeming from the defendant Garbade certain land sold under an execution on a judgment against it. The facts are that on September 28, 1898, one Gilchrist recovered a judgment against the plaintiff in the circuit court of Multnomah County for about $2,000. At the time the plaintiff was the owner of 1,200 acres of timber land in that county of the probable value of $25,000. On February 13, 1899, all its interest therein was sold under an execution issued on the Gilchrist judgment, and

---

[*]NOTE.—See, to the same effect, *Wyatt* v. *Henderson,* 31 Or. 48; *Anderson* v. *Portland F. M Co.* 37 Or. 483; *Mattis* v. *Hosmer,* 37 Or. 523; *Christenson* v. *Nelson,* 38 Or. 473.—REPORTER.

purchased by the defendant the Bridal Veil Lumbering Co., for $2,046.67, which sale was confirmed on March 7, 1899. Two days later the defendant Garbade, as a lien creditor under a judgment recovered by him against the plaintiff on January 9, 1899, for $9,108.26, redeemed from the lumbering company. Thereafter, and on March 14th, a decree was rendered against the plaintiff in favor of the lumbering company for $15 costs in a suit against the latter. On April 25th an execution was issued thereon, and the entire 1,200 acres levied upon, and advertised for sale on June 10th. On May 10, 1899, after the issuance of the execution on the $15 decree, and before the time fixed for the sale, the defendant lumbering company and Garbade entered into a written contract by the terms of which Garbade agreed that he would pursue such legal remedies as might be available to him to acquire the legal title to the property, and sell the same to the lumbering company for $12,000, $4,000 of which was paid down at the time of the execution of the agreement, and the remainder after he should acquire title. It was stipulated in the agreement, in case he failed to acquire title, he would refund the money received, with interest thereon at 10 per cent per annum. It was also agreed that, in case the property should be redeemed from Garbade, he would repay to the lumbering company such sums as may have been paid by it, with interest thereon; and in case of any redemption other than upon the Gilchrist judgment he should return any moneys received by him under the agreement, it being understood, however, that, unless ''on such redemption said party of the first part [Garbade]shall receive the moneys paid by him on redemption in said Gilchrist matter, there shall be deducted from any amount so agreed to be paid by the parties of the first part the sum of $2,067.86 (being the amount paid by said party of the first part on redemption in said Gilchrist sale), or such or any part of said amount as he shall fail to receive on such redemption, together with interest thereon at the rate of 10 per cent per annum from March 9, 1899; and the said party of the second part shall thereupon be entitled to all and

every benefit or advantage which may exist by reason of the judgment and sale on execution in said Gilchrist matter.''

Thereafter the entire property was sold under the $15 decree in favor of the lumbering company, and purchased by Garbade for $40.25, and such sale was confirmed on June 16, 1899.    The plaintiff had no actual knowledge of the sale or the confirmation until the time for the redemption had expired; but a short time after the sale, and in ignorance thereof, appealed from the judgment, and gave an undertaking to stay proceedings. On January 27, 1900, the plaintiff attempted to redeem from the sale under the Gilchrist judgment by paying to the sheriff the amount of money necessary therefor, but Garbade refused to receive it, or to recognize the validity of such attempted redemption.    Thereafter, fearing that the first redemption was irregular, and perhaps invalid, the plaintiff notified Garbade that it would redeem on March 3, 1900, at which time it appeared by its attorney at the sheriff's office, and deposited with that officer $2,271.21, the amount necessary to effect such redemption.    The defendants Woodward & Palmer, attorneys for Garbade, although present, refused to recognize the validity of this redemption, or to accept the money, and it remains in the custody of the sheriff.    Thereafter, and while matters were in this condition, negotiations for the purchase of the property were opened between the plaintiff and the lumbering company, which finally resulted in a sale thereof to the latter for $25,000, in pursuance of which the plaintiff and defendant Garbade conveyed to the lumbering company on June 21, 1900, their respective interests in the property, and Garbade was paid the balance due him under his contract with the lumbering company of May 10, 1899.    As soon as these transactions were consummated, and the money paid over to Garbade, one of his attorneys immediately appeared at the sheriff's office, and demanded the money deposited with that officer; but in the meantime the sheriff had been notified by the plaintiff that the attempt to redeem was abandoned, and not to pay the money over to Garbade or his attorneys.    Thereafter this suit was brought against the sheriff and all parties

interested in the fund to determine the ownership thereof. About the time it was commenced, Garbade and his attorneys, Woodward & Palmer, who had represented him in all the proceedings involved in this controversy, and through whom the entire negotiations were conducted, entered into an agreement to divide equally between themselves the money on deposit with the sheriff, and so they are all made parties to this suit. The decree of the court below was in favor of the defendant Garbade and against the sheriff personally for the money in his hands, from which plaintiff and defendant Frazier appeal.

Reversed.

For appellants there was a brief over the names of *Watson & Beekman, Joseph & Schlegel* and *John H. Hall,* with an oral argument by *Mr. Edward B. Watson* and *Mr. Frank Schlegel.*

For respondent Bridal Veil Lumber Co., there was a brief and an oral argument by *Mr. William D. Fenton.*

For respondents Woodward, Garbade, and Palmer there was a brief over the names of *John H. Woodward, Clinton C. Palmer* and *Charles J. Schnabel,* with an oral argument by *Mr. Woodward* and *Mr. Warren E. Thomas.*

Mr. Chief Justice Bean, after making the foregoing statement of the facts, delivered the opinion of the court.

The plaintiff contends as a matter of law: (1) That under the contract of May 10, 1899, between the Bridal Veil Lumbering Co. and Garbade, the money in controversy, if the redemption from the Gilchrist sale is to be treated as valid, belonged to the lumbering company, and, as its interest therein has been transferred to the plaintiff, it should prevail in this suit; and (2) that Garbade's refusal to accept the money, or to recognize the validity of the redemption, was a waiver of any claim to it on his part, which became irrevocable when plaintiff notified the sheriff that the attempted redemption was at end, and not to pay it over to him. We do not deem it necessary to con-

sider either of these questions, because we are all agreed that upon the facts the equities are with the plaintiff, and it is entitled to the relief demanded. The evidence shows beyond controversy that the defendants, Woodward & Palmer, who were the representatives and acted for the defendant Garbade in all the transactions, not only refused to accept the money deposited with the sheriff for the redemption, but insisted that such redemption was void until after Garbade had parted with all his interest in the property and had received all the money he was entitled to either on account of his judgments against the plaintiff or the contract between himself and the lumbering company of May 10, 1899; and that they allowed and permitted the property to be sold and conveyed by the plaintiff to the lumbering company under the belief, induced by their acts, silence, and conduct, that Garbade had and would make no claim to the money deposited with the sheriff for redemption. Mr. Joseph, attorney for the plaintiff, testifies that, although Garbade and his attorneys were notified of the purpose to redeem, neither of them appeared at the sheriff's office on January 27th, at the time the first redemption was attempted; that shortly afterwards he met the defendant Palmer, who claimed that the redemption was invalid because not authorized by the plaintiff corporation; that, after looking the matter up, he concluded, in order to avoid question about the matter, to redeem again. A meeting of the board of directors was thereupon called, and a resolution passed authorizing the redemption. Notice was served upon Garbade, and witness further testifies that on March 3d "I went to the sheriff's office to make this redemption. Mr. Garbade was represented by Messrs. Woodward & Palmer, who appeared at that time. The sheriff had obtained a certificate of deposit for the money paid him January 27, 1900, and at the time of the redemption on March 3d I simply added the accrued interest from the date of the last redemption, and paid that in money to the sheriff. Messrs. Woodward & Palmer appeared there, and asked if the sheriff had the money. The sheriff said, 'Yes.' They said, 'Produce it.' The sheriff then pro-

duced the certificate of deposit, and Mr. Palmer laughed, and
said: 'That don't go. You have got to produce the money,
—the cash itself,—and this is money that has been paid in
at a prior time. This certificate of deposit cannot be used,'
—and then they left the sheriff's office * * The same afternoon
I telephoned Mr. Thielsen that I thought I better get the
money and tender it to Messrs. Woodward & Palmer, or at
least get the cash and have the cash in his possession. I went
to the Merchants' National Bank, and in about ten minutes
Mr. Thielsen came, and got the money, and I saw him take
the money in a sack.'' Mr. Meyer, one of the deputy sheriffs,
testifies that about 2:45 or 2:55 a certificate of deposit for
$2,250.61 was taken to the bank and cashed, and ''I tele-
phoned to Mr. Palmer that the cash, amounting to $2,271.20,
was at hand, and he replied that he didn't care for that, as
that was not the trouble, or words to that effect.'' Mr. Duni-
way, who was the attorney for the lumbering company, and
assisted in drawing the contract of May 10, 1899, between it
and Garbade, and who was very anxious to acquire the title
to the property for his clients, testifies that he thought the
redemption was invalid, and that Garbade was entitled to a
deed to the property; that he and Woodward went to the
sheriff and his legal adviser, and tried to get him to execute
a deed to Garbade under the Gilchrist sale, and threatened to
commence a mandamus proceeding to compel him to do so,
but the sheriff refused to make such a deed; that afterwards
Mr. Bradley, the manager of the lumbering company, con-
cluded that it would be better to consider the second redemp-
tion as valid, whereupon he and Bradley went to the office
of Woodward & Palmer, stated to them the views of the lum-
bering company, and requested them to withdraw and accept
the money on deposit with the sheriff; but they objected to
doing so, giving as a reason that the time might expire without
redemption from the $15 sale, and it would be well to wait,
and see whether or not a deed could be obtained under such
sale, before taking any decided action in the matter of the
attempted redemption. It was thereupon understood and

agreed by Duniway and Woodward & Palmer that no further steps should be taken by Garbade touching the attempted redemption, but the money should be allowed to remain with the sheriff, so far as they were concerned, until after it was ascertained whether Garbade would be able to obtain a deed under the sale made on the $15 decreee.    And this, as Duniway says, was on the theory that the redemption was ineffectual, and that the refusal of Garbade to accept the money would increase his ''equities'' under the sale on the $15 decree.

This was the condition of affairs when the negotiations referred to were entered into between the Bridal Veil Lumbering Co., and plaintiff, resulting in a contract by which the lumbering company agreed to purchase of plaintiff for $25,000 the land owned by it, and which had been sold under the Gilchrist judgment and under the $15 decree, to be paid or secured substantially as follows: $1,000 down; the acceptance by Garbade of the money paid the sheriff to redeem the premises from the sale made on the Gilchrist judgment as a part of the amount due him; the payment by the lumbering company of the jugdment in favor of Garbade and against the plaintiff amounting at that time to $10,143; and the execution and delivery of its promissory notes for the balance.    After the terms of the sale had been agreed upon, and before the time for redemption under the $15 decree had expired, Mr. Fenton, attorney for the lumbering company, called upon Woodward in reference to the matter, and, as he testifies ''communicated to him, as the attorney for Mr. Garbade, substantially the details of the proposition made by the Larch Mountain Investment Co., and the proposition and acceptance made by the Bridal Veil Lumbering Co.    Judge Woodward said to me that he thought we were foolish in undertaking to negotiate with these people until after the expiration of the year; that the year would expire, as I remember, the 16th or 17th of June, or somewhere in that neighborhood. * * I said to him that my client, the Bridal Veil Lumbering Co., was not willing to stand upon that sale or rely upon that title; that

41 OR.—9.

they desired to purchase from the Larch Mountain Investment
Co., and end all litigation; that I had some question as to the
validity of that sale, and as a business proposition my clients
had concluded to deal with the Larch Mountain Investment
Co., at the same time keeping their contract with Mr. Garbade.
'Well,' he said, 'they may discover that this sale has been made,
and they may redeem, and you will deprive us of our oppor-
tunity to carry out that contract.' I remember saying to him,
'We will take whatever title you have, and, if you haven't
anything, we won't get anything from you, but we will take a
deed from Mr. Garbade under that contract.' But I said: 'In
the arrangement we are making with the Larch Mountain In-
vestment Co., the $2,370 that is in the sheriff's hands is to
go to the credit of the Bridal Veil Lumbering Co., and you
ought to draw down that money yourself, or else you ought to
give an order.' Either at the first interview or the second inter-
view—I don't know which—Judge Woodward said Mr. Gar-
bade was at Oregon City, or somewhere out of town; and he
said Mr. Garbade would have nothing to do with the $2,370;
that he had not recognized it as a redemption, and that he
would maintain a consistent course, and wouldn't surrender
the certificate, and wouldn't give an order and wouldn't draw
down the money himself, and give credit on that contract.
He said, 'you can pay your money under that contract, and
that money will take care of itself.' I said, 'If we pay
you the full amount under the contract, then you people
will turn up and claim the $2,370.' He said, 'Mr. Gar-
bade will have nothing to do with that, and has never recog-
nized that as a redemption.' " The result of this conversa-
tion, together with Woodward's statements and disclaimers,
were by Mr. Fenton immediately communicated to the repre-
sentatives of the plaintiff.

During the interview it was suggested that Mr. Fenton pre-
pare such papers as he desired to have Garbade execute, and
send them over to Woodward's office. In pursuance of this
arrangement the papers were prepared, and sent over on the
morning of the 21st, by Mr. Bradley, the manager of the

lumbering company, together with a note from Fenton requesting Woodward & Palmer to have the two certificates of sale held by Garbade assigned to Judge Watson, so that Watson could draw down the money in the sheriff's hands, and that he and his wife could quitclaim to the lumbering company.   Mr. Bradley testifies that he had quite a long conversation with both Woodward and Mr. Palmer, and that they suggested that the lumbering company was very foolish to go on with the negotiations, for the reason that they hoped to get title under the sale made in the $15 case, so that they could sell it to the company for $12,000, while under the contemplated arrangement it was paying $25,000.   "I told them that our board of directors had held a meeting, and that we had discussed all these matters, and had decided that from purely a business standpoint that we preferred to go ahead with these negotiations and purchase the property, get possession of it immediately. * * After arguing some time, * *  they said they were ready to close a contract if we paid them the amount of money which was due upon it.   I told them that in these negotiations it was contemplated that part of this money (I think the sum of $2,270 and some cents) that they should draw that from the sheriff, and should apply it in part payment upon what we owed—upon the $12,000 contract,—and that we were ready to pay them the balance; and their reply was that they would not have anything to do with this money in the sheriff's hands, but that, if we would pay the full amount down under their contract with the lumbering company, they were ready to comply with it."   The witness further testifies that he went from there over to the office of the plaintiff, and informed its attorneys of his conversation with Woodward & Palmer, and what they were willing to do.   On the morning of June 21st, Mr. Duniway, at the request of Mr. Fenton, had an interview with Woodward & Palmer in reference to the proposed sale of the property, and Duniway testifies that after considerable conversation with Palmer he (Palmer) stated that Garbade would not execute the papers which had been sent over by Mr. Fenton, but that if the lumbering company would

pay to him $8,891.10, the balance due on his contract with it, Garbade would execute certain deeds and assignments. The plaintiff being advised of this fact, and of the negotiations between the representative of the lumbering company and Garbade, concluded that it could safely consummate the contract on the theory that Garbade made no claim to the money in the sheriff's hands. It thereupon conveyed the property to the lumbering company, and caused to be paid to Garbade, at the office of Woodward & Palmer, about 5 o'clock in the afternoon of June 21st, the balance due him under the contract of May 10, 1899, and Garbade conveyed to the lumbering company all his interest. in the property in controversy, and executed some other papers necessary to effect a complete settlement and adjustment of all matters between them.

When it was ascertained that the deal would be consummated, the defendant Palmer, without the knowledge of any of the other parties to the transaction, went to the sheriff's office, leaving the final consummation of the matter to Woodward, and as soon as he (Palmer) was advised by telephone that the transaction had been closed, and the money paid to Garbade, for the first time demanded the money of the sheriff previously deposited with him by the plaintiff for the purpose of redeeming from the sale under the Gilchrist judgment. But one of the plaintiff's attorneys, two or three hours prior to that time, becoming suspicious that some such plan was contemplated, had notified the sheriff not to pay the money over to Garbade or his attorneys. All the transactions in reference to the attempted redemption and all negotiations looking to the sale of the property were had with Woodward & Palmer alone. Garbade did not personally appear in the matter until just a few moments before the final papers were executed. Messrs. Woodward & Palmer, in their testimony, give a slightly different coloring to the facts from that detailed by other witnesses, but there is really no substantial conflict.

1. We have thus set out the testimony somewhat in detail, because, in our opinion, the facts speak for themselves, and require no argument to show that the equities are all with the

plaintiff. It is apparent from the entire testimony that, so long as it was deemed to be to the interest of Garbade to deny the validity of the attempted redemption, and to refuse to accept the money paid to the sheriff for that purpose, his attorneys persistently and consistently occupied that attitude; and, having assumed that position, they ought not to be permitted to change it to the injury of the plaintiff, simply because it is to their interest to do so. It is an elementary principle that if one, by his statements as to matters of fact or as to his intended abandonment of asserted rights, induces another to change his condition in reliance upon them, he will afterwards be estopped to deny the truth of the statements, or to enforce his rights against his declared intention to abandon them. In short, one cannot play fast and loose, but, having taken a particlar position deliberately, he must act consistently with it, and cannot assume a contrary position to the prejudice of another: *Shields* v. *Smith,* 37 Ark. 47, and Bigelow, Estoppel, 713. This is the position the defendants occupy in this case. By their conduct and statements, as well as their silence when they should have spoken, they naturally induced the lumbering company and the plaintiff to believe that they did not intend to recognize or admit the validity of the attempted redemption, or make any claim for the money deposited with the sheriff for that purpose. Having assumed that attitude, and allowed the contract between the plaintiff and the lumbering company to be consummated under such a belief, Garbade is clearly estopped from afterwards changing his position to their injury.

It is true, as the defendants insist, that Woodward & Palmer, acting for Garbade, refused to consent that he should transfer his certificates of redemption, or give an order on the sheriff for the money on deposit with him; but it is also true that, although advised by Mr. Fenton of the terms of the contract between the plaintiff and the lumbering company, they did not inform him, or any other witness in the case, that Garbade intended to claim a right to the money in addition to the amount due him under the contract of May 10th. When it

was explained to Woodward that it was contemplated that
the redemption money should be applied on the balance due
under such contract, Woodward did not say that the money
belonged to Garbade, but, on the contrary, stated to Fenton
that he "would have nothing to do with the $2,370, that he
had never recognized it as a redemption, and that he would
maintain a consistent course." The subsequent refusal to
transfer the certificates or give an order on the sheriff for the
money was in harmony with this declaration of Garbade's pur-
pose and conduct. If it was intended that Garbade should
claim the money on deposit with the sheriff, equity and fair
dealing required that such intention should have been made
known during the progress of the negotiations, and not, as the
evidence clearly indicates, an attempt made to conceal his real
purpose. The defendant Palmer's conduct in leaving his office
at the time the money was ready to be paid to Garbade, and
hurrying up to the sheriff's office, and there waiting until ad-
vised that the transaction had been consummated, and then for
the first time demanding the money, is most cogent and con-
vincing proof that defendants knew that the plaintiff and the
lumbering company had acted with the understanding and be-
lief that the money in the sheriff's hands would belong to them,
and not to Garbade. This action on the part of Mr. Palmer
was not the result of a sudden impulse. It was attended with
every evidence of a deliberate and thoroughly arranged plan.
He took with him to the sheriff's office copies of all papers
necessary, as he thought, to establish Garbade's claims to the
money, and would probably have secured it had it not been for
the previous notice to the sheriff by the plaintiff not to pay
it over.

2. It is argued that the plaintiff's remedy is at law, and not
in equity, and that the findings of the trial court on conflicting
testimony should not be disturbed on appeal. No objection to
the jurisdiction was made in the court below, but, on the con-
trary, the defendants answered, asking affirmative relief, and
so waived that question: *Kitcherside* v. *Meyers,* 10 Or. 21;

O'Hara v. Parker, 27 Or. 156 (39 Pac. 1004); Municipal Sec.
Co. v. Baker County, 33 Or. 338 (54 Pac. 174).

3. The effect to be given to the findings of the trial court on
an appeal from a decree was considered, and the true doctrine
announced, in Nessley v. Ladd, 29 Or. 354 (45 Pac. 904).
There is nothing in the opinions in Willis v. Smith, 36 Or. 601
(58 Pac. 527), or Browning v. Lewis, 39 Or. 11 (64 Pac. 304)
to conflict therewith. The decree of the court below will
therefore be reversed, and one entered here for the plaintiff.

REVERSED.


Argued 27 February; decided 24 March, 1902; rehearing denied.