Decided at PENDLETON, July 18, 1896.

## NESSLEY v. LADD.
[45 Pac. 904.]

1. PRACTICE IN SUPREME COURT IN EQUITY CASES — REFEREE'S REPORT.— Under section 543, Hill's Code, providing that on appeal from a decree the suit shall be tried anew upon the transcript and evidence, it is the primary duty of the supreme court to try an equity case anew; and, while the report of the referee and the findings of

the trial court may be considered, especially where the evidence is conflicting, they are only advisory, and do not relieve the appellate court from the duty of deciding the case for itself: *Howe* v. *Patterson*, 5 Or. 353; *O'Leary* v. *Fargher*, 11 Or. 225, approved and followed; *Fahie* v. *Lindsey*, 8 Or. 475; *Lovejoy* v. *Chapman*, 23 Or. 571; *Bruce* v. *Phœnix Insurance Company*, 24 Or. 486; and *Justice* v. *Elwert*, 28 Or. at page 464, criticised.

2. PREPONDERANCE OF EVIDENCE.— The long and involved testimony in this case fails to establish that Freeman S. Ladd executed and delivered to John R. Ladd a deed to the land in controversy as claimed.

3. ADVERSE POSSESSION BY TENANT.— A tenant cannot acquire title by adverse possession unless he openly and explicitly disclaims any holding under his former landlord, and unreservedly asserts that he is the owner of the true title, all with the knowledge of the former claimant.

From Union: MORTON D. CLIFFORD, Judge.

This is a suit by Homer Nessley against Freeman Ladd to quiet the title to certain premises described as the southwest quarter of the southwest quarter of section twenty-eight, and the west half of the northwest quarter, and the southeast quarter of the northwest quarter of section thirty-three, all in township two south, range thirty-eight east, Willamette Meridian, situated in Union County, Oregon. Plaintiffs allege that they are the owners in fee and in possession of said premises, and claim title through mesne conveyances from the government, and also by open, notorious, exclusive, and adverse possession under claim of title since the —— day of May, eighteen hundred and seventy-two. It is further alleged that defendant claims an interest in the premises adverse to the plaintiffs, under the same patent from which plaintiffs deraign title. The prayer is for a decree quieting and confirming the title in plaintiffs. The

answer admits plaintiffs' possession, and that defendant claims an interest under a patent from the government, but denies their adverse possession and ownership, and other material allegations of the complaint; and, further answering, defendant alleges ownership in himself by patent from the government of the United States, and right to possession, and that the possession claimed by plaintiffs prior to September twenty-third, eighteen hundred and ninety, was in subordination to defendant's title. These affirmative allegations of the answer were put in issue by the reply. The cause was referred to Hon. T. G. Hailey, to report the testimony, together with his findings of fact and law, and, a decree having been entered in conformity therewith, the plaintiffs appeal. The facts are sufficiently set out in the opinion for an understanding of the case.

AFFIRMED.

For appellants there was an oral argument by *Messrs. Lewis B. Cox* and *J. F. Baker*, with a brief by *Messrs. Baker and Baker, Cox, Cotton, Teal and Minor*, and *J. M. Carroll*, urging these points:

The acts of dominion exercised by John R. Ladd over the land are *indicia* of ownership, and throw the burden of proof on respondent: Hill's Code, § 776, subdivision 13; *Rowland* v. *Williams*, 23 Or. 575; *Jackson* v. *Hillsborough*, 1 Dev. and Bat. 177; *Doming* v. *Miller*, 33 Barb. 386; *Smith* v. *Lorillard*, 10 Johns. 338.

So also the reputation as to John R. Ladd's own-

ership is presumptive evidence thereof: *Wilson* v. *Maddock*, 5 Or. 480; *Bartel* v. *Lope*, 6 Or. 321.

The following authorities bear upon various aspects of the case: 1 Wharton on Evidence, § 410; 1 Starkie on Evidence (4th Am. ed.), 517; *Stitt* v. *Huidekopers*, 84 U. S. (17 Wall.), 384; *Ray* v. *Donnelly*, 4 McLean, 504; *Miller* v. *Richardson*, 2 Ired. Law, 250; *Black* v. *Black*, 38 Ala. 111; *Jones* v. *Laney*, 2 Texas, 342.

For respondent there was an oral argument by *Messrs. Charles H. Finn* and *Thomas H. Crawford*, with a brief making these points:

The character of the possession, viewed in the light of the original entry, must be such as to afford the owner the means of knowing its adverse character and claim: *Hicklin* v. *McClear*, 18 Or. 126; *Bingham* v. *Kern*, 18 Or. 200.

A permissive occupancy of another's land is not hostile, and no difference how long continued, it must be deemed to be in subordination to the title of the true owner, and will never bar his entry: *Anderson* v. *McCormick*, 18 Or. 305; *Abraham* v. *Owens*, 20 Or. 511.

The burden of proving all the essential elements of adverse possession, including its hostile character, is upon the party relying upon it: *American Company* v. *Bradford*, 27 Cal. 361; *Lick* v. *Diaz*, 30 Cal. 75; *Garwood* v. *Hastings*, 38 Cal. 223; *DeFrieze* v. *Quint*, 94 Cal. 653.

The claim of title, which is an indispensable element of adverse possession, has in it nothing of

stealthiness, nor is it elastic or flexible. There must be publicity, continuity, and good faith in its assertion, leaving no room for doubt by the person against whom it is asserted that his title. is disputed, and a hostile title asserted: *Potts* v. *Coleman,* 67 Ala. 221; *Worcester* v. *Lord,* 56 Me. 265 (96 Am. Dec. 456); *Denham* v. *Holeman,* 26 Ga. 182 (71 Am. Dec. 198).

Where the entry upon the premises is permissive, the statute will not begin to run against the legal owner until an adverse holding is declared, and notice of such change is brought to the knowledge of the holder of the legal title: 1 Am. and Eng. Ency. of Law, 251; *Grube* v. *Wells,* 34 Iowa, 148; *Calvin* v. *McCune,* 39 Iowa, 502; *Davenport* v. *Lebring,* 52 Iowa, 365; *Smith* v. *Stevens,* 82 Ill. 554; *Perkins* v. *Nugent,* 45 Mich. 156; *Collins* v. *Johnson,* 47 Ala. 304; *Alexander* v. *Wheeler,* 69 Ala. 332; *Bartlett* v. *Secor,* 56 Wis. 520; *Allen* v. *Allen,* 56 Wis. 202; *Roebke* v. *Andrews,* 26 Wis. 311; *Harvey* v. *Tyler,* 69 U. S. (2 Wall.), 328; *Silva* v. *Wimpenny,* 136 Mass. 253; *Wilkinson* v. *Thompson,* 82 Mo. 317; *Dean* v. *Tucker,* 58 Miss. 487.

The element of notorious hostility to the title of the true owner is an indispensable ingredient of adverse possession. This notorious hostile. possession cannot be inferred except from proof of an express or implied denial of the owner's title, accompanied with such acts or declarations on the part of the holder as are sufficient to put the true owner on notice that the land is claimed and held in hostility to his rights: *Rihgo* v. *Woodruff,* 43 Ark.

469; *Haffendorfer* v. *Gault,* 84 Ky. 124; *McDonald* v. *Fox,* 20 Nev. 364; *Hicklin* v. *McClear,* 18 Or. 126; *Evans* v. *Templeton,* 69 Texas, 375; *Chicago, etc., Railway Company* v. *Galt,* 133 Ill. 657; *Maudlin* v. *Cox,* 67 Cal. 387; *Denham* v. *Holeman,* 26 Ga. 182; *Sparrow* v. *Hovey,* 44 Mich. 63; *Russell* v. *Davis,* 38 Conn. 562; *Grant* v. *Fowler,* 39 N. H. 101; *Creekmur* v. *Creekmur,* 75 Va. 430.

Opinion by MR. JUSTICE WOLVERTON.

1. Before proceeding to a discussion of the facts, we will determine a controversy which has arisen touching the practice of courts of equity involving the effect to be given to the reports of referees empowered to make findings of fact and law, and to such findings by the lower courts. The respondent contends, as expressed in the brief of his counsel, that "the findings of a referee, in an equity case, based upon conflicting testimony, where the truth can only be arrived at by weighing the evidence and considering the credibility of the witnesses, will not be disturbed by an appellate court. This is especially true, where the referee is a lawyer of good standing, selected by the judge on account of his ability and fitness for the position, and he attends personally upon the taking of the testimony, and observes the manner and conduct of the witnesses while upon the stand, and his findings have been approved by the lower court"; while the appellant's counsel contend that the rule is not so broad, and state it thus: "It has been a stand-

ing rule of action declared by this court that find-
ings of fact made by a referee will not be disturbed
where there is evidence to support them, but this
means only that where the court is in doubt as to
the determination of a controverted proposition of
fact, the question will be referred to the conclu-
sion of the referee, whose superior advantages,
arising from the testimony being given in his pres-
ence, will be allowed to go in solution of the
doubt." The question involved has been alluded to
a number of times in the decisions of this court,
but it seems not to have been so well settled as
to exclude a divergence of opinion among able
counsel as to what rule has been adopted. The
statute provides, Hill's Code, § 543, that " Upon an
appeal from a decree given in any court, the suit
shall be tried anew upon the transcript and evi-
dence accompanying it." The construction of this
statute first came up in *Howe* . v. *Patterson*, 5 Or.
353, and it was there insisted that the conclusions
of fact found by the judge on the hearing in the
court below were conclusive upon the parties on
appeal. To this proposition, however, the court did
not assent, but held that an appeal in an equity
proceeding " removes the cause entirely, subjecting
the fact as well as the law to a review and re-
trial." In a subsequent case, (*Fahey* v. *Lindsey*, 8 Or.
at page 478,) Kelly, C. J., says: " These (questions
of fact) were controverted and contested matters
before the referee, upon which a great deal of
testimony was taken on both sides. And after
hearing it the referee found on all these questions

adversely to appellant. Exceptions were taken by
her  *  *  *  and the exceptions were not sus-
tained by the court. In such cases this court will
not reverse a decree, unless the findings of the
referee are clearly against the weight of testimony,
which we think is not so in this case." This
language is criticized by WATSON, J., in *O'Leary* v.
*Fargher*, 11 Or. at page 226, (4 Pac. 330,) which he
says "is much stronger than the provisions of our
Code for appeals in equity cases will warrant. In
our view of the statute, an equity case is to be
tried over again in the appellate court upon every
issue, both of law and fact, not waived in the
lower court, and without regard to the result of
the previous trial, whether had altogether before the
court or partly before a referee."

This latter case seems to have settled the prac-
tice until the rendition of some later decisions. In
*Lovejoy* v. *Chapman*, 23 Or. at page 574, (32 Pac.
687,) Mr. Justice MOORE says: "The conflict in the
testimony as to the amount due the defendant ren-
ders the true account between the parties difficult
of ascertainment. There are, however, some circum-
stances which seem to illustrate the dealings of the
parties, and no doubt aided the referee in reaching
a conclusion that the plaintiff's theory was correct."
Then after stating three several facts upon which it
is supposed the referee acted in coming to his con-
clusion, he continues: "The referee had the advan-
tage of seeing the witnesses and of hearing them
testify, and from this fact he is better able to pass
upon the weight of evidence than any court can be

29 OR.— 24.

from an inspection of the record; and, since there are circumstances which tend to corroborate him, we must conclude that his findings are correct, and that the defendant has inadvertently overlooked or forgotten that each mortgage or other security embraced all the preceding loans." Again, in *Bruce* v. *Phœnix Insurance Company*, 24 Or. at page 492, (34 Pac. 16,) after stating the testimony, he says: "Upon this contradictory evidence the referee found that the company had not waived the condition of the policy which required proof of loss within sixty days from the time of the fire, by informing the plaintiff that the loss would not be paid. It is impossible for the appellate court, in the examination of a record, to determine the preponderance of evidence with that degree of certainty attainable by a court or referee who saw the witnesses, heard them testify, and noted their manner and appearance while on the witness stand; and the findings made under such circumstances will rarely be disturbed when there are other facts and circumstances which tend to weaken the testimony of the defeated party, or to corroborate the conclusion reached." After this follows a discussion of the evidence in detail upon which this court's conclusions were reached in the case. Again, in *Justice* v. *Elwert*, 28 Or. at page 604, (43 Pac. 650,) the writer says: "The plaintiffs, however, admit that they have not fully performed, but claim that whatsoever has been left undone by them was excused by the acts of Mrs. Elwert. The court below found that she refused to allow or permit plaintiffs to fully comply with the conditions of

the contract, which finding appears to be supported
by the testimony, although we find much conflict
therein.  But the court having seen the witnesses,
heard them testify, and observed their demeanor
while upon the stand, its finding ought not to be
disturbed, unless clearly against the weight of evi-
dence."

This latter proposition, in so far as it seems to
state a general rule of law, is perhaps too broad,
and possibly misleading; but to the extent that it
indicates the method of the court in arriving at the
conclusions it is not open to criticism.  It will be
noted that in each of these later cases this court
has carefully gone through and weighed all the evi-
dence.  Indeed, it is the constant habit of the court
in equity cases, though arduous and oftentimes bur-
densome, to carefully read and consider all the testi-
mony accompanying the transcript, and without
special reference to the findings of the referee of
the court below.  The statutory requirement is that
the "suit shall be tried anew upon the transcript
and the evidence accompanying it," and the court
has in every instance of which we have any knowl-
edge followed the direction of the statute in that
respect.  But it sometimes transpires that evidence
is adduced for and against a contested proposition
of apparently equal weight, when read from the
depositions, as it must be here, or the evidence
touching the same is very conflicting and unsatisfac-
tory, as where one witness affirms and another of
seemingly equal credit flatly denies, in such cases
the findings of the referee and the court below have

been considered of material value, where they have had the opportunity of seeing the witnesses, hearing them testify, and marking their demeanor while on the witness stand, and were thereby the better enabled to determine whether the witness was speaking the truth or not, and as to which were entitled to the greater credit. The findings of the referee may be considered as only advisory to the court below, and, unless excepted to, will ordinarily be affirmed without question; and, as the legislature has required the court below to make and file its findings upon which to base the decree, they were probably intended as advisory to this court, which may affirm, modify, or reject them in toto, as the testimony may warrant. But it is the primary duty of this court to try the case anew,— that is, entire, upon the transcript and the evidence accompanying it; and it is only for the purpose of resolving a doubt which may arise from the conflicting and contradictory nature of the evidence that the findings of the referee or the court below are resorted to and become of value, and then it may be said to be a cogent argument that because of the superior advantages accorded them they are more likely to be right than this court could be if their findings should be entirely discarded. The process is somewhat analogous to the practice which prevails in the federal courts of sending doubtful questions of fact to a jury, to inform the conscience of the chancellor, but the verdict is not binding upon the judgment of the court. It is simply advisory, and the court may disregard it en-

tirely, or adopt it either partially or wholly. "The decree which it must render upon the law and the facts must proceed from its own judgment respecting them, and not from the judgment of others": *Basey* v. *Gallagher*, 87 U. S. (20 Wall.), 670; *Kohn* v. *McNulta*, 147 U. S. 240 (13 Sup. Ct. 298); and *Garsed* v. *Beall*, 92 U. S. 695.

2. In deciding this case upon the facts we can scarcely do more than state our conclusions, as the testimony is somewhat voluminous, and it would serve no good purpose to set out any considerable portion of it here. Homer F. Nessley, one of the plaintiffs, filed on the land in dispute on October seventh, eighteen hundred and seventy-one, and in May, eighteen hundred and seventy-two, for the consideration of four hundred and fifty dollars, sold his claim to it to the defendant Freeman S. Ladd, who, on March tenth, eighteen hundred and seventy-three, received a patent therefor from the government. The record evidence touching the land subsequent to the date of this patent consists of three deeds, one executed by Eva Andross and Miles Andross, her husband, to Rachel Ladd, March fifteenth, eighteen hundred and eighty-eight; one by Charles W. Ladd and Alice Ladd, his wife, to Rachel Ladd, March twentieth, eighteen hundred and eighty-eight,— each purporting to convey an undivided half-interest therein; and one from Rachel Ladd to the plaintiffs Homer Nessley, Charles Nessley, and Frank Nessley, executed September twenty-third, eighteen hundred and ninety, and purporting o convey the whole estate. Each of the deeds to

Rachel warrants the title to one third interest only, but her deed to the Nessleys contains a full covenant of warranty. Rachel Ladd is the widow, and Eva Andross and Charles W. Ladd are the children of John R. Ladd, who died October fourteenth, eighteen hundred and eighty-seven. The widow afterwards married T. J. Hilts, and is known herein as Rachel Hilts. John R. Ladd, the deceased, and Freeman S. Ladd, the defendant, were brothers. It is claimed by plaintiffs that about the year eighteen hundred and seventy-four Freeman S. Ladd made, executed, duly acknowledged, and delivered to John R. Ladd a deed to this land, and that said deed, without having been recorded, was destroyed by fire some time in eighteen hundred and seventy-six, with which deed the chain of title in the Nessley people would be perfect. But, aside from this, it is also claimed that plaintiffs and the Ladds, their predecessors in interest, have been in the open, notorious, exclusive, and adverse possession, under a claim of title, for more than ten years prior to the commencement of this suit, and have thereby a perfect title. To maintain either or both of these propositions plaintiffs must support them by a preponderance of the evidence. The alleged consideration for the deed from Freeman S. Ladd to John R. Ladd, supposed to have been burned, is a deed executed and delivered by Caleb F. Howell and wife to Freeman S. Ladd, for one hundred and sixty acres of land in section two, township two south, range thirty-eight east, January twelfth, eighteen hundred and seventy-four. This claim was entered Decem-

ber second, eighteen hundred and sixty-nine, by
Howell as a homestead, and was thereafter, on
March twenty-third, eighteen hundred and seventy-
four, commuted, and cash certificate number two
hundred and eighty-five issued therefor, and on Jan-
uary fifteenth, eighteen hundred and seventy-five
patent issued to him by the government. John R.
Ladd was in possession of the premises in dispute
since about the year eighteen hundred and seventy-
two up to the time of his death, October fourteenth,
eighteen hundred and eighty-seven. He leased it
from time to time, and received the rents and
profits. Since his death his widow and heirs con-
tinued in possession until the transfer to plaintiffs
in September, eighteen hundred and ninety; and
since then plaintiffs have had the possession. The
defendant denies that he ever made a deed to John
R. Ladd, and claims that his possession was under
license from him and by his permission; that he
and John entered into an agreement soon after he
entered the land, whereby it was understood that
John was to go into possession, and have the use
thereof, in consideration that he should pay the
taxes thereon, and pasture defendant's stock certain
seasons of the year, breed his horses, and furnish
him with a home, when not elsewhere employed;
that no time was fixed by the agreement touching
the period of John's occupation, but that he contin-
ued in possession with such understanding until his
death.

The features of the controversy thus delineated
mark the line of dispute between the parties. The

key to the situation is, perhaps, the question whether John R. Ladd purchased and paid for the Howell tract; and yet the deed from Freeman to John may have passed upon some other consideration, so we will examine both questions in the same connection. The most pertinent and about the only testimony of much value touching the Howell deed is that of Howell himself and the defendant, together with the fact, which is matter of record, that the deed was actually made by Howell to Freeman S. Ladd.. Howell testifies: "I made a trade with John R. Ladd for one quarter section of land on Sand Ridge between Island City and Summerville. John R. Ladd paid me for the land, and my recollection now is that I made the deed to him. I made no deed in eighteen hundred and seventy-four to Freeman S. Ladd, nor do I remember to have made any deed to him at any time." "I remember that John R. Ladd said something about buying the land for his brother Freeman, but John paid for the land, and my recollection is that I made the deed direct to John R. Ladd." "I know nothing of any deed to land to Freeman S. Ladd dated in eighteen hundred and seventy-four. The considera-tion of the land sold by me was twelve hundred dollars in money, paid me in cash at the time of sale by John R. Ladd. I know nothing of any deed to land dated at any time, and purporting to be signed by me as grantor and given to Freeman S. Ladd as grantee." "I do not think the matter was ever talked about when Freeman S. Ladd and John R. Ladd were both present. I have talked

with both of them about it, but never, as I remem-
ber, in the presence or hearing of the other." On
cross-examination, he says Freeman never lent him
two hundred dollars for any purpose, and that he
never borrowed a cent of money from Freeman in
his life. "I did not know Freeman S. Ladd in the
transaction; the contract was made with John R.
Ladd, and the money paid by him, and, so far as
I ever knew, it was John R. Ladd's money." The
defendant Freeman S. Ladd testifies, when asked
how he came to purchase the land (the Howell
place): "He (Howell) got into a tight place, and I
loaned him four hundred dollars, and took his note
for it." "He was going to take a lot of hogs; he
took them up in the hot weather, and he made a
failure of them, and lost a good many of them.
Then he came back and he says 'Freeman, you will
have to take the place for your loan.' He wanted
one thousand dollars for the place. I asked him if
he had a deed to it, and he said he did; and I told
him I wouldn't give him a dime for the place if he
didn't have a title, and he says 'if you will furnish
the money for a deed put up the money,' I will
make you a deed, so I gave him two hundred dol-
lars more, which was six hundred dollars for a
note, and he turned his homestead into a preëmp-
tion. I don't know how he did it; he did it some
way; he got a patent." After he made final proof
"he said that Eaton had a mortgage on the place,
and he had to raise money to pay that mortgage
off, and after he had made the final proof, got the
patent, why I bought it of him. The place cost me

twelve hundred dollars." " I sent the money over by John Ladd, he was going to Union to finish paying it up. I sent the note and one thousand dollars, counting one thousand dollars with the note. He had two hundred dollars to pay out, to pay the government." John brought back the deed and delivered it to Freeman.

In this connection the testimony of Ephraim Hammock is pertinent. He says: " He (Howell) left the place either in seventy-one or seventy-two. Cale Howell himself, I think, lived on it in the winter of seventy-two, or in the spring afterwards. After he sold out, he left it. He fed hogs there, after that he went off and left it. I heard John Ladd tell him that he would give one thousand dollars for the place. The trade was considered good at that time but there was no money paid, no papers made, no exchange nor anything of the kind." This witness also states that Howell had offered the place a day or two before to his father-in-law, Mr. Pro, for one thousand dollars. This is the sum and substance of the evidence touching the execution and delivery of this deed. John was the older of the two brothers, was a man of some education, and at times transacted business for Freeman, who was illiterate. It is impossible to reconcile the testimony of Howell with that of Freeman S. Ladd, but we think the attendant circumstances support that of Ladd rather than Howell. Howell says he executed the deed to John R. Ladd, but it shows for itself that it was executed to Freeman. Howell says that John paid

him twelve hundred dollars in cash at the time he delivered the deed. This is probably not true, as all he asked for the place in the first instance was one thousand dollars but he could not sell unless he obtained a title from the government. Without the title, Freeman says he would not give him a dime; and this he could do only by commuting his homestead, which would cost him two hundred dollars. That the homestead claim was commuted less than a year before he could have made final proof thereon, there can be no question. Howell had bad luck with his hogs, and his wife being afflicted, he had to send her east before selling his place. These and other circumstances evidently made him anxious to sell and leave the premises as Freeman testifies. Had he remained there until December second, eighteen hundred and ninety-four, he could have obtained a patent under his homestead filing without the additional two hundred dollars' expense which it cost him to obtain the commutation. In order to get the thousand dollars out of the place, all he asked, it was necessary to commute at an additional expense of two hundred dollars, which was quite likely advanced by Freeman, as he says, and which, added to the one thousand dollars, makes the final consideration for the transfer. The fact that the deed was made in the neighborhood of sixty days (the time required for publication of final proof) prior to the issuance of the cash certificate by the government is also a circumstance which would indicate that the two hundred dollars had been advanced as

Freeman claims it was. Howell says he talked with both John and Freeman about the trade, and did not pretend to know what arrangements existed between them. Freeman testifies, however, that it was his money that paid for the land, and in this he is not contradicted, except in so far as his admissions from time to time to the effect that he and John had traded places might give rise to the inference that John must have traded the Howell place for the land in dispute.

Homer Nessley testifies that he saw the deed from Freeman to John in the fall of eighteen hundred and seventy-three, that he read it entire, and that it was duly witnessed and acknowledged. Mrs. Hilts, the widow, says John handed her the deed immediately after she arrived home from the east. She did not read it, but saw the indorsement on the back, which showed it was a deed from Freeman to John. After much vacillation as to the time when she first saw the deed, she finally and positively fixes it at the time she returned home from the east. This was in April, eighteen hundred and seventy-three. The date fixed is in disparagement of their testimony, as the deed from Howell to Freeman was not made until January, eighteen hundred and seventy-four; but it cannot be expected that witnesses can fix with exactness the dates of transactions of such long standing. T. J. Hilts says while looking through a trunk with John, where he kept his valuable papers, he (witness) picked up a deed, and said to John "Here is a deed from Freeman to you," to which John replied, "Yes; I must have that re-

corded; that is the deed between Freeman and I of the north half of the river ranch." This was in eighteen hundred and seventy-six. Freeman testifies positively that he never executed such a deed to John. Several witnesses were called, however, who show that Freeman has from time to time made admissions inconsistent with the ownership of the land in dispute; while, upon the other hand, witnesses were called who testified to statements of John inconsistent with any claim of title in the premises; and again, we are left to determine which is right, in the light of probabilities. Homer Nessley's explanation of how he came to see the deed is that John wanted to sell him the place, and told him that he had a deed from Freeman, and to assure him of the fact asked him to go from the field where he was plowing to his (John's) house some distance away. He went with him to the house, and saw the deed, but they could not trade, as John wanted five hundred dollars more for the land than he was willing to give. Nessley at that time was twenty-two or twenty-three years of age. Now, it appears that John was acumulating rather than disposing of land about that time, as is shown by several deeds from the State of Oregon, one executed in seventy-one and three in seventy-two. All these state deeds were filed and recorded in the clerk's office for Union County on September eighteenth, eighteen hundred and seventy-seven. Again, if, as Mrs. Hilts testifies, the trunk containing all John's valuable papers of which she had charge was destroyed by fire, it would seem that these four state

deeds would have gone the same way. They were filed and recorded, however, long after the alleged fire. Another fact of some weight is that if such a deed was executed and delivered John must have known of its destruction in eighteen hundred and seventy-six; but there is not a word of testimony that he ever endeavored to obtain another deed from Freeman, or to establish or have confirmed in any way his title to the premises. It is true that a day or two before John's death, while he was unable to talk or to recognize his own people, and shortly after his death, the widow and heirs requested Freeman to deed this land to them, but the request included two or three other tracts, and, so far as we are enabled to discover, it was not then insisted that Freeman had ever made a prior deed to any of the lands which they wanted him to deed to them. Upon the whole, we do not think that plaintiff has established the execution of the deed in question by a preponderance of the evidence.

3. We come now to the adverse possession. It is not seriously disputed but what John R. Ladd went into possession of the premises under license from Freeman. The evidence establishes that such was the case. Where tenancy is once shown to exist, in order to set the statute of limitations running in favor of the tenant desiring to avail himself of it to acquire title by adverse possession, he must openly and explicitly disclaim and disavow any and all holding under his former landlord; and, furthermore, he must unreservedly and steadily assert that he himself is the owner of the true title, all which

must be brought home to the knowledge of the rightful owner: Wood on Limitations, 651; *Floyd* v. *Mintsey*, 7 Rich. (S. C. Law), 189. It is not definitely shown that John R. Ladd ever did any of these things. The probability is that he continued to occupy under the conditions upon which he entered without either a repudiation of the license or an assertion of title in himself. That is to say, it has been made to appear more probable that these conditions prevailed until John's death in eighteen hundred and eighty-seven, than other conditions which would evince an adverse holding. After his death, the widow and heirs did assert ownership with sufficient notoriety as to bring knowledge of it home to Freeman, but since then sufficient time has not elapsed to bar an entry or establish title. The decree of the court below will be affirmed.

AFFIRMED.

Decided at PENDLETON, July 18, 1896.