# McCALL, *Respondent,*
## *v.*
# HYDE, et al, *Appellants.*
### (No. 76-1045-E, CA 10851)
#### 592 P2d 1064

Brian J. Hawkins, Grants Pass, argued the cause for appellants. With him on the brief was Sloan, Hawkins & Neufeld, Grants Pass.

No appearance for respondent.

Before Schwab, Chief Judge, and Buttler and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Plaintiff brought this suit to quiet title to a one and one-half acre parcel of land to which he claimed title by adverse possession. After trial to the court, a decree was entered declaring plaintiff owner of the disputed property and enjoining defendants from asserting any claim or title thereto. Defendants appeal.

The property in question was part of a larger parcel owned by Emmett Hyde prior to 1960 and until his death on November 16, 1964. On August 15, 1960, with Hyde's permission, plaintiff and his family moved into a house which they had just built on the one and one-half acre tract. Plaintiff has been in continuous possession of the property ever since, either personally or through caretakers. In 1972 he brought a suit against Emmett Hyde (who was then deceased) and his heirs to quiet title to the same parcel. After trial, the court concluded that plaintiff had not established by a preponderance of the evidence that he had adversely possessed the property for the 10 years immediately preceeding the initiation of the suit.

Following that suit, the State, acting through the Public Welfare Division (PWD), was issued letters of administration for the estate of Emmett Hyde. Thereafter, PWD sent plaintiff a letter purporting to give him permission to remain on the property until the probate court had determined a reasonable amount of rent. Plaintiff did not respond to that letter. When an investigator from PWD later came to inquire about his ability to pay rent, plaintiff produced the letter and argued (successfully) that it entitled him to remain on the property without paying rent until the probate court took some action. This suit was commenced on November 29, 1976.

■ To establish title by adverse possession, the claimant must prove by clear and positive evidence actual, open, notorious, hostile, continuous and exclusive possession for the statutory period of 10 years under a

[533]

claim of right or color of title. *Lee v. Hansen*, 282 Or 371, 578 P2d 784 (1978); *Beaver v. Davis*, 275 Or 209, 550 P2d 428 (1976). Defendants do not dispute that plaintiff was in actual possession of the parcel continuously for 10 years. They argue that he failed to establish that his possession was under an asserted claim of right hostile to that of the legal owners, or alternatively, that any adverse claim was abandoned by the acknowledgment of defendants' title implicit in plaintiff's acceptance of and reliance on PWD's offer to remain on the property without paying rent.

■ Plaintiff testified that when he took possession of the property in 1960 he did so under a written agreement with Emmett Hyde that Hyde would give him the property in exchange for $150 worth of firewood. No conveyance was ever made. Plaintiff did not produce the alleged written agreement and has not sought at any stage of this proceeding to rely on that agreement to establish any rights to the property. In fact, when defendants' attorney objected to the introduction of testimony concerning the agreement, plaintiff's attorney expressly disavowed such reliance and stated that the evidence was only being offered as background for the determination of when plaintiff's "status might have changed from that of a purchaser to that of an adverse possessor." Moreover, any claim that the period of adverse possession commenced when plaintiff entered the property under the purported agreement was precluded by the decree in the 1972 suit to quiet title. We therefore treat plaintiff as one who took possession with the permission of the legal owner but later sought to claim the property as his own. That was the theory on which the case was tried.

■ Where a claimant seeking to establish title by adverse possession originally entered the premises with the permission of the legal owner, his possession is considered in subordination to that of the legal owner and does not start the statutory period running until, by words or conduct, the claimant asserts that he is holding in his own right and brings that assertion to

the knowledge of the rightful owner. *Parrish v. Minturn*, 234 Or 475, 382 P2d 861 (1963); *Nessley v. Ladd*, 29 Or 354, 45 P 904 (1896). To establish the requisite assertion of intent to possess the property as his own, plaintiff relies solely on an alleged conversation with Frank Hyde, son of Emmett Hyde. We have no particular reason to doubt that the conversation took place or that plaintiff expressly claimed the property as his own. The crucial issue is when it took place.

Plaintiff's testimony on that point was as follows: (Direct examination):

"Q: *** [D]o you recall if Frank Hyde ever talked to you about this property and your right to live on it?

"A: Oh yeah, yeah.

"Q: Did you have a conversation with Frank Hyde?

"A: Yeah.

"Q: Do you know when this took place?

"A: Oh, it was a little while after I got the house built.

"Q: Was this before Emmett Hyde?

"A: Umm, I think maybe one time I talked to him before.

"Q: I see, and did Frank Hyde ever demand that you move from the property?

"A: Oh yeah, he moved me off.

"*****

"Q: Did you have a conversation with Frank Hyde about your right to live on the property?

"A: Well, he was going to move me off of there.

"Q: And did you go to talk to Mr. Hyde, Mr. Frank Hyde, or did he come to talk to you?

"A: He came to talk to me.

"Q: Where did this conversation take place?

"A: On my front porch.

"Q: Okay, and do you think this conversation was before or after Emmett Hyde died?

"A: Oh, that there was after.

"Q: And it was after Emmett Hyde died?

"A: Yeah.

[535]

"Q: Do you know how long after he died?

"A: I don't know exactly.

"Q: Would it be, would it have been a few years or ** *

"A: Oh, it was only a short while.

"Q: Short while after Emmett Hyde died?

"A: After he died, yeah.

"Q: And what, what did Frank Hyde say to you?

"A: He asked me when I was going to move. I says, 'I ain't going to move.' 'Why?' I says, 'Bought and paid for the place with the permission of Welfare.'

"Q: Okay, and was that the end of the conversation?

"A: Yeah, that was the end of it because this wasn't anything he could do unless he wanted to hit me right in the nose.

"*****"

(Cross-examination):

"Q: I believe you said you had a conversation with Frank Hyde after Emmett Hyde died?

"A: Yes.

"Q: Okay, and it was during that conversation that Mr. Hyde asked you to leave the property?

"A: Frank.

"Q: This was after Mr. Hyde's, after Emmett Hyde's death?

"A: Yes, yes."

(Redirect examination):

"Q: Mr. McCall, after you paid the taxes [in 1972 just before the first quiet title suit] and after you cut the wood for Emmett Hyde, did Frank Hyde tell you to get off the property?

"A: Yeah, he told me to get off right after I got the house all fixed up nice and the well dug and the garden fixed up and everything so he could rent it out probably.

"Q: And do you know approximately what year that was, Mr. McCall?

"A: Well, that was—must have been about '72, some where along there, 3.

"Q: You mean about four years ago?

"A: Yeah, five maybe.

[536]

"Q: Is that how long ago it was?

"A: Yeah, something like that. I don't remember just exactly how many years it's been now.

"Q: Do you know how long it was after Emmett Hyde died?

"A: Well, it wasn't very long after he died till he was trying to get me out of there.

"*****

"Q: Mr. McCall, do you know about how long after Emmett Hyde died that Frank Hyde told you to get off the property?

"A: Oh, it was right after he died there.

"Q: Now, if he died in 1964, do you know what year it would have been or how many years after 1964?

"A: Oh, well, it lacked a year when my case came up before, it lacked a year of me being there ten years. The judge told me to wait till next year.

"Q: That's not my question, Mr. McCall. My question is when you had this conversation with Frank Hyde at your place, do you know how many years it was after Emmett Hyde died?

"A: I don't. I don't remember. Don't remember."

Plaintiff's other witness testified that "a couple years after Mr. Hyde died" he had had a conversation with Frank Hyde, at which time the latter said that "he was going to move [the McCalls] out." A year or two later Frank Hyde again told him that he was "going to get rid of McCall off that place."

We review *de novo* on the record. ORS 105.605; 19.125(3). We conclude that plaintiff did not establish by clear and positive proof that he had asserted to Frank Hyde a hostile claim of right to the property in question at least 10 years before.[1] Plaintiff testified that he had a conversation with Frank Hyde prior to Emmett Hyde's death, but he did not relate the

[1] The trial court made no finding as to when the alleged conversation took place. The court found that plaintiff's adverse possession began when he moved onto the property in 1960. That finding was not supported by the evidence and, moreover, was precluded by the decree in the earlier quiet title suit.

[537]

substance of that conversation.[2] The conversation in which plaintiff did assert a hostile claim did not occur until after Emmett Hyde died, but plaintiff's evidence did not establish with any precision how long after the elder Hyde's death that conversation took place. At one point he said "a short time" after; at another point he stated it was in 1972 or '73; finally, he conceded that he just did not remember. The testimony of the other witness did not bear on the timing of that conversation at all but only on statements made to the witness by Frank Hyde.

We conclude that plaintiff did not establish title by adverse possession.

Reversed.

---

[2] We need not pass on the question whether a statement made to Frank Hyde, the son, would have sufficed during the father's life.