Argued and submitted January 27, reversed and remanded with
instructions October 13, reconsideration denied November 23,
petition for review denied December 15, 1982 (294 Or 212)

RISE,
*Appellant,*

*v.*

STECKEL,
*Respondent.*

(No. A7905-02322, CA A20395)

652 P2d 364

Ferris F. Boothe, Portland, argued the cause and filed the briefs for appellant.

Richard Dobbins, Portland, argued the cause and filed the brief for respondent.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Plaintiff brought this proceeding for a declaratory judgment. He seeks a declaration that he has a life estate in a residence occupied by defendant and a judgment for the fair rental value of the residence during ten years of defendant's occupancy.[1] Defendant's answer asserted the affirmative defense of laches and a counterclaim of adverse possession. The trial court decided that plaintiff's real property claims were barred by laches. We reverse.

The residence at issue is located at 8923 S.E. Reedway Street, in Portland. The residence and an adjoining lot were owned by Opal Brown until her death in 1963. Opal was Alice Steckel's mother and plaintiff's grandmother.

In 1962, Opal executed a will. Plaintiff testified that Opal told him the will gave the residence to him, subject to a life estate in Alice. Errol Lamb testified about statements and actions of Alice concerning Opal's will that he observed shortly after Opal's death. At the time Lamb made the observations, he was married to Marilyn Steckel, daughter of defendant and Alice and half-sister of plaintiff. Lamb testified as follows:

"Q. [MR. BOOTHE:] And did — was there an incident that occurred in which a document alleged to be a will was burned?

"A. Yes, there was. I was in the kitchen.

"Q. Would you tell the Court what happened?

"A. I was in the kitchen drinking coffee, and Jim Steckel and Alice were in the bedroom talking, periodically, for a long period of time on and off.

"They had been in and out of the bedroom, which was off of the kitchen by the bathroom. I was in there with Marilyn, drinking coffee.

"I'm hazy — I don't really have a vivid recollection of Jim Steckel. He stayed in the bedroom. If Jim Steckel had left prior to Alice coming out — but Alice came out, talking and crying, and talking to Marilyn, and had the will with her and said, 'This leaves — '

---

[1] Plaintiff also requested a declaration of rights with respect to certain personal property but does not appeal from the portion of the final order denying his rights therein.

"MR. DOBBINS: Your Honor, I object. This is all hearsay."

The trial court sustained the objection, and plaintiff offered the evidence under the rule.

"Q. [MR. BOOTHE:] Just so you understand this: The Judge has ruled in his ruling that this is inadmissible. But to preserve our record, for a possible appeal, it comes under the rule of whether the Court and maybe the appellate court can reconsider whether it should be heard by the Court.

"A. Okay. As I said, I don't know if Jim came out — out through the bedroom into the living room and passed through. After, he certainly was not in the room when this will was burned.

"Marilyn and her mother at that time were talking. Her mother was crying and saying, 'I hate to do this, but Nan has left everything to Jimmy, and she's left me a lifetime estate. But Jimmy and Jim Steckel hate each other, and Jim Steckel would have no place to go and, you know, I'm dying of cancer.'

"She and Marilyn discussed this. 'Besides, Nan only left you some garnet earrings and a necklace.' And she said, 'Now, if I burn this will, then I can leave Jim Steckel a lifetime estate, and Jimmy will get the property after because I'll leave that to him.'

"Q. And then what happened?

"A. Then she burned the will and put it in the front — there's a trashburner in front of the stove. And she set the will on fire and put it in there.

"MR. BOOTHE: We're out from under the rule. I would again offer that testimony.

"THE COURT: Very well."

Opal's estate was administered without a will by Alice in 1965. As Opal's sole heir, Alice inherited the residence and the adjoining lot. Shortly before her death in 1965, Alice executed two deeds disposing of her real property. She conveyed the adjoining lot to defendant in fee simple and disposed of the residence as follows: a life estate for herself and defendant, providing that if defendant survived her, his life estate would exist only until he remarried, then a life estate for plaintiff, so long as he paid

the taxes levied on the residence when due, and finally a fee simple to Marilyn Steckel.

On December 12, 1965, Alice died, and defendant's life estate in the residence began. Less than two months later, on January 24, 1966, defendant married Berna Miller, and his life estate ended.

A wedding reception was held at the residence at issue on the day of defendant's remarriage. The reception included the usual indicia of a wedding reception: a cake, presents and napkins and plates imprinted with "wedding." Although plaintiff was not invited, he attended the reception because he believed his former wife, Shirley, was there. When plaintiff entered the reception, the wedding cake was concealed in an oven. Plaintiff maintains that he did not realize the gathering was a wedding reception and that he did not see the cake, napkins or plates, because he "only had eyes for Shirley."

Defendant and Berna lived at the residence from 1966 to 1978. Plaintiff knew that defendant was living with Berna, but he testified that he did not know of defendant's remarriage until 1978 when defendant told him that he and Berna were getting divorced. Between 1966 and 1978, plaintiff asked defendant many times whether he had remarried. Plaintiff testified that defendant always denied that he had remarried but said instead that he was "shacking up" with Berna. Plaintiff's wife testified that on one occasion she heard defendant tell plaintiff that he was not married to Berna. Defendant testified that he neither affirmed nor denied to plaintiff that he had remarried but that he avoided responding to plaintiff's questions. Marilyn and defendant's next door neighbor testified that they each had informed plaintiff in 1966 of defendant's remarriage.

On May 17, 1979, plaintiff initiated this action in equity to recover possession of the residence. The trial court's findings of fact, conclusions of law, and judgment relevant to the real property are as follows:

"FINDINGS OF FACT AND CONCLUSIONS OF LAW

"* * * * *

"As to plaintiff's declaratory judgment seeking a declaration of rights as to real property, the court finds that

plaintiff intentionally delayed an unreasonable length of time of more than 13 years before asserting his right to succeed as life tenant to the property. Defendant showed by clear and convincing evidence that plaintiff knew of the marriage of the defendant for the entire period of the marriage and chose to do nothing until after defendant's divorce at a time when plaintiff was forced to leave a former residence due to a condemnation proceeding by the City of Portland.

"The Doctrine of Laches should be invoked. Plaintiff's delay in asserting his claim to the real property worked to the prejudice and disadvantage of the defendant. Defendant sold adjacent land which he held in fee simple and used the proceeds of said sale for reinvestment into the subject property. Defendant made a good faith effort to maintain the premises and paid substantial property taxes over a 14 year period. There was clear and convincing evidence that plaintiff did not timely exercise his right to his life estate while defendant was married.

"JUDGMENT

"NOW, THEREFORE, IT IS HEREBY DECREED:

"Defendant's life estate will remain intact under the terms and conditions of the original deed and will terminate upon remarriage or his death. The life estate of plaintiff will ensue until plaintiff's death, or so long as plaintiff pays property taxes as required under the deed, at which time, the land will inure to the benefit of Marilyn Wood, or the land will inure to the benefit of either James Steckel or his estate by bargain and sale deed."

Plaintiff makes three assignments of error: first, the trial court erred by applying laches, because the clean hands doctrine should have prevented defendant from asserting laches and because defendant did not meet his burden of proving the defense; second, the trial court erred in the portion of its decree concerning the ownership of the property after the life estates of defendant and plaintiff, because the eventual ownership of the property was not at issue in the suit; and third, the trial court erred by failing to admit into evidence Lamb's testimony of Alice's statements and actions concerning the burning of Opal's will. Because of our decision, we need not address defendant's second assignment of error.

■ The principles underlying the general rule that one who comes into equity must have clean hands have been expressed as follows:

" "* * * [E]quity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief. Equity denies affirmative relief for such conduct * * *.

" *'The maxim is based on conscience and good faith. It is not strictly or primarily a matter of defense, but is invoked on grounds of public policy and for the protection of the integrity of the court.'* " (Emphasis in original.) *Taylor et ux v. Grant et al*, 204 Or 10, 24, 279 P2d 479, 279 P2d 1037, 281 P2d 704 (1955) (quoting 30 CJS 475, *Equity*, § 93 (1965)).

" "* * * While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim, He who comes into a court of equity must come with clean hands * * *.' " *North Pacific Lumber Co. v. Oliver*, 286 Or 639, 650, 596 P2d 931 (1979) (quoting 2 Pomeroy's Equity Jurisprudence § 398 at 93-4 (5th ed 1941)).

■ Defendant argues that the clean hands doctrine applies only to parties plaintiff, not to parties defendant. From the statements quoted above, however, it is apparent that the principles underlying the doctrine can encompass the conduct of both plaintiffs and defendants. It applies to any party who seeks either the affirmative or defensive intervention of the court for equitable relief. In a case in which the defendant sought the intervention of a court of equity by asserting an affirmative equitable defense, the Oregon Supreme Court inquired whether the defendant's conduct called for the application of the clean hands doctrine to bar the defense. *Baxter v. Redevco, Inc.*, 279 Or 117, 566 P2d 501 (1977). The court held that on the facts of that case, defendant's conduct did not justify the imposition of the clean hands doctrine. The case illustrates, however, that the clean hands doctrine *can* apply to bar affirmative equitable defenses.

■ At trial in the present case, defendant asserted the affirmative defense of laches, and plaintiff raised the clean hands doctrine. It is unclear whether the trial court refused to impose the doctrine for legal or factual reasons, because the findings of facts and conclusions of law do not directly address the issue. Nevertheless, this court can invoke the doctrine on its own motion. *Gratreak v. North Pacific Lumber Co.,* 45 Or App 571, 577, 609 P2d 375, *rev den* 289 Or 373 (1980).

■ ■ Having decided that a defendant's inequitable conduct can bar his reliance on the defense of laches, we must decide whether defendant's conduct prevents his reliance on laches. The clean hands doctrine applies to a broad range of misconduct.

> " '* * * [A] litigant may be denied relief by a court of equity on the ground that his conduct has been inequitable, unfair and dishonest, or fraudulent and deceitful as to the controversy in issue.' " *Baxter v. Redevco, Inc., supra,* 279 Or at 121 (quoting 27 Am Jur2d 667, *Equity* § 136 (1966)).

Plaintiff alleges two types of misconduct by defendant. The first relates to defendant's actions regarding Opal's will. Plaintiff apparently reasons as follows: Opal left a life estate in the residence to Alice and a remainder interest to plaintiff; defendant and his wife knew that the wife was dying of cancer; therefore, defendant and his wife conspired to destroy the will so that defendant's wife, as Opal Brown's sole heir, would inherit the residence in fee simple and could deed defendant a life estate.

To support his reasoning, plaintiff introduced the testimony of Lamb about the burning of Opal's will. The trial court ruled that the testimony was inadmissible hearsay. On appeal, the parties agree that the trial court should have admitted the testimony. Even if the trial court's failure to admit the testimony was error, the error was harmless, because the evidence was not sufficient to call for the imposition of the clean hands doctrine against defendant. *See Downey v. Travelers Inn,* 243 Or 206, 213, 412 P2d 359 (1966).

■ Lamb's testimony concerning Opal's will is relevant to the issue of defendant's misconduct. Defendant was

guilty of serious misconduct if Opal's will left defendant's first wife only a life estate in the residence with a remainder to plaintiff and if defendant and his wife conspired to destroy the will. While Lamb's testimony does provide evidence of the contents of the will, it provides scant support for a conspiracy between defendant and his wife to destroy the will. In fact, Lamb's testimony that defendant was not present when the will was discussed and burned tends to indicate that defendant was not involved in the destruction of the will. For this court to conclude that defendant was guilty of misconduct, we would have to infer the following: Lamb accurately and truthfully recalled statements he heard 15 years before the trial; Alice accurately depicted the contents of Opal's will; and defendant, who was not present during the discussion of the will or its destruction, was nonetheless engaged in a conspiracy with his wife to destroy the will. The evidence is insufficient to establish misconduct on the part of defendant regarding Opal's will. We will not impose the clean hands doctrine to bar defendant's laches defense on the basis of speculation.

The second type of misconduct alleged by plaintiff concerns defendant's lack of full disclosure of his remarriage. Plaintiff testified that defendant repeatedly denied to plaintiff that he had remarried. Defendant testified that he never affirmed or denied to plaintiff that he had remarried but that he always avoided responding to plaintiff's questions regarding remarriage. Accepting defendant's testimony, his failure to disclose his remarriage on specific inquiry would be sufficient to justify the imposition of the clean hands doctrine.

However, misconduct is not the sole test.

> " 'Necessity for injury to complainant. — The party to a suit, complaining that his opponent is in court with "unclean hands" because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. * * *' " *Baxter v. Redevco, Inc., supra,* 279 Or at 121-22 (quoting 2 Pomeroy's Equity Jurisprudence 99, § 399 (5th ed 1941)).

If plaintiff did not rely on the defendant's concealment, he could not have been injured by it. The trial court found

that plaintiff knew of defendant's remarriage for the entire period of the marriage but chose to do nothing about it until 1978. Although our review of this equity case is *de novo,* the trial court's findings are entitled to great weight where only interested witnesses testify, the testimony is conflicting and the credibility of the witnesses is decisive. *Adamson v. Adamson,* 273 Or 382, 389, 541 P2d 460 (1975); *Main v. Howard,* 52 Or App 797, 804, 629 P2d 870 (1981). The trial court's findings are supported by the undisputed fact that plaintiff attended defendant's wedding reception and the evidence of two witnesses who testified that they told plaintiff in 1966 of defendant's remarriage. The trial court's finding is supported by the great weight of the evidence. We conclude that defendant's concealment of his remarriage caused no injury to plaintiff, and we will not invoke the clean hands doctrine to bar defendant's laches defense.

■ Defendant contends that plaintiff's action for possession of the residence is barred by laches. Laches has three elements: (1) the plaintiff must delay asserting his claim for an unreasonable length of time (2) with full knowledge of all relevant facts, (3) resulting in such substantial prejudice to the defendant that it would be inequitable for the court to grant relief. *Stephan v. Equitable S & L Assn.,* 268 Or 544, 569, 522 P2d 478 (1974); *Clackamas Co. Fire Protection v. Bureau of Labor,* 50 Or App 337, 342, 624 P2d 141, *rev den* 291 Or 9 (1981).

■ Although equity is said not to be bound by statutes of limitations, those statutes are generally applied by analogy when laches is asserted. *Albino v. Albino,* 279 Or 537, 553, 568 P2d 1344 (1977); *Hanns v. Hanns,* 246 Or 282, 306, 423 P2d 499 (1967). When an action is commenced after the expiration of the analogous statute of limitations, the plaintiff has the burden to prove the absence of laches. *Albino v. Albino, supra; Allied Vet. Council v. Klamath Co.,* 23 Or App 653, 662, 544 P2d 190 (1975). In the present case, the analogous statute of limitations is ten years. ORS 12.040, 12.050. Plaintiff commenced this suit 13 years after he had learned of the marriage and has the burden to prove that he is not guilty of laches.

The evidence clearly established the first two requirements of laches. Plaintiff delayed bringing this

action for possession of the residence for 13 years when he had full knowledge of defendant's remarriage. The critical issue is whether plaintiff's delay resulted in substantial prejudice to defendant.

The harm or prejudice to a defendant necessary to the laches defense can be either a disadvantageous change in position or loss of witnesses or critical documentary evidence caused by the plaintiff's delay. *Hanns v. Hanns, supra,* 246 Or at 309. There is no evidence in this case that any witnesses or documentary evidence were unavailable due to plaintiff's delay. The trial court decided that plaintiff's delay caused defendant to change his position to his disadvantage on the basis of these facts: Defendant sold the adjoining lot to pay expenses connected with the residence; he paid for a new roof and for the residence to be painted; and he paid property taxes of approximately $3000.

Notwithstanding defendant's expenditure of significant funds to maintain the premises and to pay property taxes, we disagree with the trial court's conclusion that plaintiff's action was barred by laches. From the time of his remarriage in 1966 to the present, defendant has lived in the residence without paying rent. Plaintiff introduced expert testimony that the fair rental value of the residence from March, 1969, to May, 1980, exceeded $29,000. Defendant produced no evidence on the subject. Therefore, the burden on defendant in the form of expenditures for maintenance and property taxes was far outweighed by the benefit he received in the form of rent-free occupancy of the residence since 1966. Plaintiff met his burden to prove no prejudice. The trial court incorrectly found laches.

Because the trial court agreed with defendant's affirmative defense that plaintiff's action was barred by laches, it did not address defendant's counterclaim. The counterclaim is based on defendant's assertion that he had established adverse possession of the residence and was entitled to have a life estate quieted in him. Defendant's counterclaim sounds in equity, ORS 105.605, and we review *de novo. Nedry v. Morgan,* 284 Or 65, 67, 584 P2d 1381 (1978). Although the trial court's findings of facts and

conclusions of law do not directly address defendant's counterclaim, the parties briefed the issue of adverse possession, and we have before us all the evidence necessary for review. In the interests of judicial economy, we will address the issue.

 To acquire property through adverse possession, the claimant must prove by clear and convincing evidence, actual, open, notorious, hostile, continuous and exclusive possession for the statutory period of ten years under a claim or right or color of title. *Lee v. Hansen,* 282 Or 371, 375, 578 P2d 784 (1978); *McCall v. Hyde,* 39 Or App 531, 533-34, 592 P2d 1064 (1979). Permissive use, no matter how long continued, is not hostile and cannot be the basis for adverse possession. *Scott v. Elliott,* 253 Or 168, 178, 451 P2d 474 (1969).

> "Where a claimant seeking to establish title by adverse possession originally entered the premises with the permission of the legal owner, his possession is considered in subordination to that of the legal owner and does not start the statutory period running until, by words or conduct, the claimant asserts that he is holding in his own right and brings that assertion to the knowledge of the rightful owner. * * *" *McCall v. Hyde, supra,* 39 Or App at 534-35.

This rule has been applied to a grantor who retained possession after conveying the premises to the grantee, *Parrish v. Minturn,* 234 Or 475, 382 P2d 861 (1963), to one cotenant against another cotenant, *Smith et al v. Tremaine et ux,* 221 Or 33, 350 P2d 180 (1960), and to a tenant against his former landlord. *Nessley v. Ladd,* 29 Or 354, 45 P 904 (1896).

The same rule applies in the present case. After the deaths of Opal and Alice, defendant obtained the right to possession under Alice's deed. When defendant remarried in 1966, he lost his life estate and right to possession. Because defendant continued his possession after the termination of his life estate, he became a tenant at sufferance of plaintiff, ORS 91.040,[2] who had the right to possess the

---

[2] ORS 91.040 provides, in part:

"One who comes into possession of the real estate of another lawfully, but who holds over by wrong after the termination of his term, is considered as a tenant at sufferance. * * *"

residence. Therefore, the ten-year statutory period for adverse possession did not begin to run until defendant asserted to plaintiff that he was possessing the property in his own right, rather than as a tenant at sufferance.

According to defendant's own testimony, he avoided responding to plaintiff's questions concerning his remarriage and his right to possess the residence. It was not until 1978, when defendant refused plaintiff's demand for possession, that defendant's words and conduct clearly asserted his intention to possess the residence in his own right. Plaintiff filed this action for possession of the residence in 1979. The ten-year period has not run, and defendant has not acquired a life estate in the residence through adverse possession.

In addition to declaratory relief, plaintiff has requested damages of $50,000 for the fair rental value of the residence during the last ten years of defendant's occupancy. Plaintiff is entitled to recover the fair rental value of the property for the six years prior to the filing of the case and to date. ORS 12.080. Defendant is entitled to a setoff for taxes and permanent improvements made during the same period.

Reversed and remanded with instructions that the trial court enter a decree that plaintiff has a life estate and the right to occupancy of the real property as long as he pays taxes levied against the premises when due, and for a determination of rental value, less an appropriate setoff for taxes and improvements, owed by defendant; decree affirmed in all other respects.