Argued and submitted October 17, 1980,
affirmed February 9,
reconsideration denied March 19,
petition for review denied May 19, 1981 (291 Or 9)

CLACKAMAS FIRE PROTECTION DISTRICT NO. 1,
*Petitioner,*

*v.*

OREGON BUREAU OF LABOR AND INDUSTRIES,
*Respondent.*

(No. 5-78, CA 16095)

624 P2d 141

William L. Brunner, Portland, argued the cause and filed the brief for petitioner.

Rudolph S. Westerband, Assistant Attorney General, Salem, argued the cause for respondent. With him on the

brief were James M. Brown, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is an appeal from an order of the Commission of the Bureau of Labor (Bureau) in which she found that the Clackamas Fire Protection District (District or petitioner) discriminated against two job applicants on the basis of age. The Commissioner's order directed the District to pay the two complainants $10,609 and $15,307 respectively as compensation for back pay, representing the difference between what they would have earned if they had been hired by the District and what they actually did earn, and enjoined the District from setting any maximum age limit for employment as a dispatcher, the position in question. On appeal, the District contends that (1) this proceeding is barred by principles of laches or the equitable principle of unconscionable delay; (2) the final order is based upon a record not properly made and upon evidence obtained in violation of statutory requirements; (3) the order is not supported by substantial evidence in the record; (4) it was error to conclude that the maximum age set for dispatchers was not a bona fide occupational requirement; and (5) the damages ordered are not authorized by law. We conclude that the order is supported by the evidence and that no errors in procedure were committed and, therefore, affirm.

The District is a rural fire protection district organized under the provisions of ORS ch 478. In addition to its fire protection services, it operates a "Central Fire Dispatch Service," which dispatches fire and emergency equipment for five rural fire districts and the City of Milwaukie. The District, which was formerly the Milwaukie Fire Protection District, was formed in 1969 when the Milwaukie District, together with the four other districts involved, joined together to establish a central dispatch system.

Prior to centralization, each fire district maintained its own dispatch operation. Initially, dispatch duties were performed by firefighters on a part-time or rotation basis. Each district required that, to be hired for the job of firefighter, the applicant could be no older than 36 years. Sometime between 1964 and 1968, the districts began employing civilian personnel or non-firefighters on a full time

basis to perform dispatch duties. When the central dispatch system was formed, the District retained as its own personnel many of the individuals previously employed as dispatchers for the different fire districts. The District also retained many of the rules and regulations governing employment in the various districts. Some of the districts had a maximum entry age limit for civilian dispatchers, while others did not. The maximum age limit of 36 for hiring as a firefighter was retained and extended by the District's Civil Service Commission rule to all full time employees, including dispatchers.

In December, 1972, the Board of Directors of the District authorized the hiring of one Fire Alarm Dispatcher-Clerk for an existing vacancy. The position was to be filled by Civil Service open competition. Responding to a newspaper notice, Jefferson Bradley and Donald Christner, the private complainants herein, visited the District's main business office to apply for the position of dispatcher. Mr. Bradley was 36 years and 12 days of age and Mr. Christner was 47 years of age. Both were turned away and not allowed to complete the necessary application forms because they each had passed the 36th birthday. A dispatch operator was hired from the District's Civil Service eligibility list on February 1, 1973.

On December 26, 1972, and January 2, 1973, respectively, Bradley and Christner filed formal complaints with the Civil Rights Division of the Bureau of Labor alleging that the District had unlawfully discriminated against each of them in connection with their applications for employment because of age. In August, 1974, the Bureau notified the Chairman of the District's Civil Service Commission of the two complaints and asked to discuss the District's grievance procedures with him.[1] Later, a

---

[1] Complainant Bradley sent a grievance letter directly to the District's Civil Service Commission in January, 1973. The chairman of the Civil Service Commission denied receiving the letter at that time. Petitioner claims that the first notice it had of the letter was in the Bureau's letter of August, 1974. After request by petitioner, the Bureau sent the District a copy of Bradley's grievance letter.

In her findings of fact, the Commissioner found that the Civil Service Commission did, in fact, receive and discuss Bradley's letter on or about January, 1973. She found further that no internal procedure for dealing with the grievance existed and that Bradley was never given an opportunity for redress of his

request for the District rules and regulations was made. Thereafter, an investigation was conducted. On January 24, 1975, the District was notified by the Bureau that the investigation had been completed. On February 27, 1976, the Bureau informed the District that substantial evidence existed to support the claim of discrimination on the basis of age. Negotiations subsequently took place, but efforts at settlement were unsuccessful. On April 27, 1978, formal charges were filed against the District.

## I

In its first claim of error, the District contends that the Commissioner erred in failing to sustain its demurrer to the complaint on the grounds of laches or the equitable principle of unconscionable delay. Petitioner points to the fact that the Bureau's investigation was not completed until three years after the private complaints were filed with the Bureau, and a formal complaint was not issued until 2 years after that. The District notes, correctly, that ORS 659.050(1) provides, in cases such as the one before us, that after the filing of a complaint "the Commissioner may cause prompt investigation to be made * * *." The statute further provides that, if the investigations disclose substantial evidence in support of the allegation of the complaint, "the Commissioner may cause immediate steps to be taken through conference, conciliation and persuasion to effect a settlement * * *." The parties in this case agree that efforts at settlement and conciliation were made.

It is clear that there has been delay in this case, both in notifying the petitioner of the charges and in undertaking and completing the investigation. This, together with the attempted settlement efforts, caused a

---

grievance or responded to in any way. On appeal, petitioner challenges these findings as unsupported by the evidence.

The petitioner presented no evidence of the existence of any internal grievance procedure. The District does not claim that it responded to Bradley's letter. The evidence on whether it received the letter is conflicting. However, there is some evidence to support the Commissioner's finding. In any event, we need not decide the issue because the matter is not necessary to the Commissioner's final conclusion. The existence of a grievance procedure was only relevant to an employee's right of action under ORS ch 659, not an applicant's. Former ORS 659.026(2) (repealed Or Laws 1977 c 770).

delay in the filing of charges. More than a prolonged delay in initiating the litigation must be shown, however, before the doctrine of laches comes into play. As we stated in *Allied Vet. Council v. Klamath Co.,* 23 Or App 653, 661, 544 P2d 190 (1975):

> "The established rule is, in fact, that the plaintiff against whom the defense is asserted must have had full knowledge of all the facts during the period of delay, and that the delay must have resulted in prejudicing the defendant to the extent that it would be inequitable to afford the relief sought by the delaying party."

■ In this case it does not appear that the Bureau had full knowledge of the facts until its investigation was completed in January, 1975. The formal complaint was not filed until three years later, but this delay was due, in part, to settlement efforts. Recognizing that there was prolonged delay, we find no prejudice to the petitioner because of it. There is no claim that any of petitioner's witnesses or any critical documentary evidence was unavailable as a result of the delay. Petitioner's sole claim of prejudice is based on the contention that the damages awarded were allowed to accrue and compound daily during the five year period--a claim we think insufficient to justify invocation of the doctrine.[2]

## II

■ The District's next contention is that the Commissioner's final order and findings are based upon a record not properly made and upon evidence obtained, in part, in violation of the Administrative Procedures Act, ORS ch 183. The Commissioner issued a final order on October 17, 1979. Thereafter, on October 31, 1979, she issued a notice of reconsideration, specifically staying the execution of that part of the order relating to damages, and giving

---

[2] The Commissioner's award of back pay to the private complainants was based up the difference between the amount they would have earned if they had been hired by the District on February 1, 1973, and the amount they actually did earn. Complainant Bradley's award was for the period of time from February 1, 1973 through December 31, 1974. After that date Bradley obtained permanent full-time employment at a pay rate greater than or equal to that which he would have earned had he been employed by the District. Complaint Christner was awarded back pay through October 26, 1977; at that time he became a full-time student.

notice of a further hearing for the purpose of taking evidence and hearing argument on the issue of damages.

On November 26, 1979, the District filed an appeal with this court from the October 17 order. The Commissioner then petitioned this court, purportedly pursuant to ORS 183.482(6), to withdraw its order for purposes of reconsideration. That petition was allowed and the Commmissioner was given until February 15, 1980, to affirm, reverse or modify her order. Hearings on the issue of damages were held on November 28 and December 11, 1979, and January 7, 1980. Additional evidence was offered on the computation of the back pay award. The District objected to the Commissioner's authority to hold further hearings and chose not to cross-examine the witnesses or present any evidence in its behalf. An amended order was issued on February 13, 1980. The District subsequently filed an amended petition for review on April 11, 1980. It is this second petition for judicial review which is now before us.

The District claims that the Commissioner's amended order is based on a record and evidence not properly made and received because the Commissioner did not request leave from this court to take the additional evidence received at the November, December and January hearings. It is undisputed that those hearings were held after the first petition for judicial review was filed by the District.

We conclude, however, that no request was necessary. The Commissioner's notice of reconsideration of the October 17 order was issued on October 31. The District did not file its initial petition for judicial review until after that date. As we view the matter, at the time the District's petition was filed, there was no final order from which to appeal.Execution of parts of the Commissioner's order had been "stayed"--in fact, were to be reconsidered. These parts of the order were not, therefore, "final." Thus, the *order* was not "final." Without a final order in the matter, the case was not properly before us. *See* ORS 183.480(1). Thus, it was not necessary for the Commissioner to secure leave from this court before taking further evidence on the issue under reconsideration. The fact that she did not attempt to do so is irrelevant. The record on which the amended final order is based was properly made.

## III

■   The District's third claim of error is that the Commissioner's amended findings, reasoning and final order are not supported by reliable, credible and substantial evidence in the record. *See* ORS 183.482(8)(c). It also contends that the Commissioner erred in concluding that the maximum age for dispatchers was not a bona fide occupational requirement reasonably necessary for the normal operation of the District's dispatch service. We consider these matters together.

At the time of the incident in 1972, former ORS 659.026(1) provided that:

> "It is an unlawful employment practice for a public employer or any person acting for a public employer to disqualify or discriminate against any individual in any civil service entrance, appointment or promotion examination or rating, or to refuse to hire, employ or reemploy or to bar, discharge, dismiss, reduce, suspend or demote any individual because of his age if the individual is 25 years of age or older and under 65 years of age; but the compulsory retirement of employes required by law at an age under 65 years and the selection of employes on the basis of relevant educational or experience requirements or relevant physical requirements, including but not limited to, strength, dexterity, agility and endurance, are not unlawful employment practices."

Additionally, former ORS 659.030(1) provided, in pertinent part, that:

> "(1) * * *, discrimination is not an unlawful employment practice if such discrimination results from *a bona fide occupational requirement reasonably necessary to the normal operation of the employer's business,* including, but not limited to, discrimination due to the physical requirements of the employment, lack of adequate facilities to accommodate both sexes or special environmental conditions justifying such employment." (Emphasis supplied).

It is undisputed that the job of dispatcher, as described in this case, involves a great deal of emotional stress and strain. The primary responsibility of a dispatcher is to dispatch personnel and equipment as required to meet both routine and emergency situations. The District serves some 130,000 persons in an area of 36 square miles.

The frequency of calls handled by a dispatcher can average 3 per minute. That number includes non-emergency calls for information. In dispatching equipment dispatchers often have to make split second decisions, as in the case of two simultaneous emergency calls demanding the same equipment or where the equipment in a particular area is in use and a new emergency arises. Dispatchers have other duties besides dispatching, including general cleaning and janitorial work, drafting and updating street maps and maintaining equipment.

During the period of time from December, 1972, through July, 1975, dispatchers worked 24 hour shifts--24 hours on duty and 48 hours off. Only one dispatcher was assigned to each shift. A bunk next to or near the dispatch console was available to the dispatcher for resting or sleeping purposes. The evidence indicates that time would be available for resting during a normal shift. Depending upon personal preference, dispatchers stood or sat at the console when performing their dispatch operations. In 1972, the console equipment operated by dispatchers included a shortwave radio, a telephone, a telautograph (a graphic printer which transmits printed messages) and a Call Director System (a telephone system linking all fire stations).

The Commissioner found that the qualities in an applicant for the job of dispatcher which are bona fide occupational requirements reasonably necessary to the normal operation of the District's business include: good physical and mental health; normal hearing and vision; mental agility; alertness and capacity for concentration; precise articulation; personal conscientiousness and motivation; ability to take and follow orders and directions; and emotional stability. Neither party disputes this finding.

The District argues that there is a definite correlation between age and these qualities and, thus, the ability to perform the job of dispatching. It is its position that persons over the age of 36 are not able to learn as quickly and thus do not develop the same skill and efficiency in operating the dispatch equipment as a person who learns to operate the equipment at a younger age. The District relies further on the stress and strain inherent in the job, the

need for swift and accurate action and the need to insure the safety of the public. If a dispatcher becomes incapable of performing the job, makes a mistake or is slow in dispatching vital equipment, substantial harm to persons and property may result. The District argues that there is no satisfactory way to screen applicants for the qualities necessary to the job except on the basis of age and such tests as are already in use.

Based in part upon this argument, the District claims that the following findings of fact are not supported by the evidence:

"11) * * * At all times material, the Fire District made no job task analysis and undertook no studies to determine the mental effort and stress involved in performing the duties of a Dispatcher (non-firefighter).

"At all times material, the Fire District made no objective analysis and relied upon no statistical or scientific studies to establish its contention that the maximum age limit of 36 for hire as Dispatcher (non-firefighter) is an occupational requirement reasonably necessary to the normal operation of the Fire District's business.

"12) On the basis of the testimony of Dr. William Armbruster, Director of the Industrial Health Clinic of Physicians and Surgeons Hospital, Professor of Environmental Medicine at the University of Oregon Medical School, and the eminent practitioner and certified specialist in Preventive Occupational Medicine, I make the following findings of fact:

"With some exceptions, all human beings experience, as part of the dying process, physiological changes attributable to aging. These changes ultimately impair learning capacity, mental agility, and ability to cope with stress, the three attributes most necessary to a Dispatcher (non-firefighter), according to the Fire District. However, it would be very unusual, indeed rare, for those changes to become so pronounced by age 36 that they would impair an individual's mental agility, learning capacity, and ability to handle stress as necessary in dispatching for the Fire District. Much more important than age itself in determining or affecting these attributes are other factors such as general health, physical fitness, quality of personal and familial life, work environment, the existence of debilitating habits such as smoking or drinking, and ultimately,

motivation. There is no correlation between age and motivation, and, because of the many latter factors, chronological age and physiological age may not coincide in any individual.

"13) On the basis of the testimony of Dr. Peter Bullard, a licensed, psychologist practicing in the area of job-related stress; Fred Heim, Dispatch Supervisor for Marion County Fire Department; Jack Horner, Director of Emergency Communications Bureau of Portland; and Harvey McGowan, Personnel Analyst for the City of Portland, I make the following findings of fact:

"It is both feasible and practical for the Fire District to deal with applicants for the dispatcher position who are older than 36 on an individualized basis. There are a number of scientific examinations and personnel testing procedures by which the Fire District can determine, during the application process, whether the individual applicant has the requisite mental agility, learning capacity, and ability to cope with stress to perform the job of Dispatcher in a safe and efficient manner. In addition to those tests and procedures, a reliable factor determining job performance potential is an applicant's previous work experience. The more stressful the applicant's previous work experience, the more likely the applicant will be able to cope with the job-related stress experienced by dispatchers with the Fire District. Other factors indicative of work performance potential include those which I have found to be relevant and which are set out in Finding 12 above.

"14) On the basis of the testimony of Dr. Robert Rempfer, Professor of Mathematics and Statistics at Portland State University, I make the following findings of fact:

"The Fire District has established no statistical correlation between being older than 36 on the one hand and unsatisfactory work performance in dispatching for the Fire District on the other; or between any conditions which are alleged by the Fire District to be attributable to the aging process on the one hand, and unsatisfactory work performance on the other.

"15) On the basis of the testimony of all witnesses, and most specifically on the testimony of Dr. William Armbruster, M.D.; Dr. Peter Bullard, Ph.D.; Dispatch Supervisor Fred Heim; Personnel Analyst Harvey McGowan; Communications Systems Director Jack Horner, and all Fire District personnel, I make the following findings of fact:

"The age of an application for the job of Dispatcher (non-firefighter) is an irrelevant factor for determining work performance potential in the applicant. Indeed, if the applicant's age is considered, it may result in the disqualification of the individuals most able to perform dispatching in a safe and efficient manner and in the employment of individuals who, in comparison, lack those qualities which are bona fide occupational requirements reasonably necessary to the normal performance of the job."[3]

From our own review of the evidence, we conclude that there is substantial evidence to support each of these findings. The evidence indicates that the maximum age limit was inherited from the rules and regulations of the fire districts when the District was formed. No study was undertaken to determine the necessity for the rule. The evidence further indicates that, while certain changes relevant to the ability to perform the dispatch function do occur with age, these changes are not so pronounced by the age of 36 as to render persons 36 and over incapable of performing the job. Expert testimony revealed that other individual and background factors are more important in assessing an individual's capability to handle stress and learn to function quickly. All those testifying agreed that actual performance of the dispatch function is the best test of whether a given individual can perform the job. However, the various witnesses relied upon by the Commissioner also indicated that a variety of methods for screening applicants with reference to the necessary qualities are available. Finally, those experts indicated that the maturity and stability that comes with age may be a positive factor in someone's ability to perform the job.

For its part, the District introduced a list of all the dispatchers, 15 in number, who have worked for the District since 1969. Four of these individuals were hired after the age of 36. (These individuals were apparently hired after the fire districts switched to civilian dispatchers and before the centralization). These four were terminated because of unsatisfactory performance. As indicated in

---

[3] The District also challenged findings of fact #7 and #8. These are discussed in n #1, *supra*.

finding #14, a statistican testifying at the Bureau's request indicated that this number of individuals did not establish a correlation between age and the ability to perform the job. This competing evidence leads us to an examination of the standard for determining what is a bona fide occupational requirement and of the burden of proof with respect to this issue.

In *School District No. 1 v. Nilsen,* 271 Or 461, 534 P2d 1135 (1975), the court examined the phrase "bona fide occupational requirement reasonably necessary to the normal operation of the employer's business" in the context of a sex discrimination case. The court concluded that, once the Attorney General proves the existence of discriminatory conduct, the burden then shifts to the employer to prove why the practice in question is necessary to the operation of the business. *Id.,* at 483. The applicable standard of proof is that of a preponderance of the evidence. *Ibid.*

There are no Oregon cases dealing with employment and age discrimination or construing former ORS 659.026(1), *supra.* The Commissioner relied on federal decisions in analyzing this case and reaching her decision. The District relies on these same cases in arguing that, because a public safety factor is involved in this case, its burden is lighter than that specified of *Nilsen.*

In *Usery v. Tamiami Trail Tours, Inc.,* 531 F2d 224 (5th Cir 1976), and *Hodgson v. Greyhound Lines, Inc.,* 499 F2d 859 (7th Cir 1974), *cert den* 419 US 1122 (1975), the U. S. Department of Labor brought suit against the defendant bus companies under the Age Discrimination Employment Act of 1967. The language of that Act is similar to the former Oregon statute. In both cases, the bus companies had maximum age limits of 35 and 40 respectively, for the hiring of new bus drivers. This limit was related to their policy of placing new drivers on "extra board" runs, while those with senority were given regular runs. In the case of *Tamiami,* a new bus driver had to perform 7 to 12 years of "extra board" driving before having sufficient senority to obtain a regular run. In the case of *Greyhound,* new drivers faced 10 to 40 years of "extra board" driving. In both cases, "extra board" workers were on call 24 hours a day, 7 days a

week, and had to be prepared to go anywhere in the United States at any time and on short notice. It was undisputed that the work was demanding, physically exhausting and could substantially interfere with a driver's personal life. The courts in both *Tamiami* and *Greyhound* noted the defendants' responsibility and duty of care for the safety of their passengers.

In *Tamiami, supra,* the Fifth Circuit established a test based upon its decisions in *Weeks v. Southern Bell Telephone & Telegraph Company,* 408 F2d 228 (5th Cir 1969), and *Diaz v. Pan Am World Airways, Inc.,* 442 F2d 385 (5th Cir 1971), *cert den* 404 US 950 (1971), cases involving discrimination on the basis of sex. An employer faced with proof of discriminatory conduct must establish that: (1) the essence of its business operation would be undermined by doing away with the maximum age limit on hiring; and (2) if that criterion is established, the employer must either establish (a) that it

"had reasonable cause to believe, that is, a factual basis for believing that all or substantially all persons over [the maximum age] would be unable to perform safely and efficiently the duties of the job involved, [or]

(b) "that it is impossible or impractical to deal with persons over [the age limit] on an individualized basis." *Id.,* at 235-236.

The employer can meet this alternative test by establishing

"* * * that some numbers of the discriminated against class possess a trait precluding safe and efficient job performance that cannot be ascertained by means other than knowledge of the applicant's membership in the class." *Id.,* at 235.

The court declined to adopt a lesser standard than that announced in its earlier *Weeks* and *Diaz* cases, in spite of the existence of a public safety factor in the bus case. However, it did note that the job qualifications in question must be reasonably necessary to the essence of the business in that case, *viz.,* the safe transportation of bus passengers. On that basis, the court concluded that

"[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." *Id.,* at 236.

In *Hodgson v. Greyhound Lines, Inc., supra,* 409 F2d 859, the Seventh Circuit declined to apply the rationale of *Weeks* and determined that a lesser standard should be applied in a case involving questions of public safety. The court stated that it was not necessary for Greyhound to

"show that all or substantially all bus driver applicants over forty could not perform safely * * *." *Id.,* at 863.

It was sufficient if the employer demonstrates

"* * * that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers * * * it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." *Id.,* at 863.

In this case, the Commissioner adopted the standard set out in *Tamiami.* However, she also concluded that the District had failed to carry its burden under either test. She found that the District had only established that certain qualities must exist in an applicant if the applicant is to perform dispatching in a safe and efficient manner. It did not satisfy her that it had a rational and scientific basis for believing that the elimination of its age limit would increase the likelihood of injury to the public or that there is a rational basis for believing that all or substantially all persons past the age of 36 are unable to perform dispatching duties in a safe and efficient manner. Neither, in her view, did the District demonstrate that it is impractical or impossible for it to deal with applicants over the age of 36 on an individual basis. These are conclusions which a reasonable person could draw from the evidence presented.

The District, in addition to the evidence already cited, offered the opinions of its employees and officers on the necessity of the maximum age limit. They expressed the opinion that the District's age requirement was necessary to the normal operation of the dispatch function and that there was no other way to effectively screen applicants incapable of performing the job. Their opinions were based on the nature of the job and personal belief and observation, including observation of the four individuals hired after the age of 36. They indicated that those persons could not handle the demands of the job, became mixed up, could

not make the necessary decisions quickly and were hard to train. As we indicated, however, expert opinion indicated that this small sampling did not establish a statistical or scientific basis for the District's practice. Further, it is not clear from the evidence what kind of screening these four individuals went through and whether it was the same as that used by the District after adopting Civil Service Commission procedures for the hiring of dispatchers.[4]

The only other evidence offered on the District's behalf was the testimony of Dr. Welch, a specialist in internal medicine and an associate at the University of Oregon Medical School in occupational medicine. Dr. Welch, who testified that he was familiar with the functions of a dispatcher, stated that there is a correlation between age and fatigue, the ability to learn, and the ability to handle stress. As such, he felt that age could be considered a bona fide employment criterion for dispatchers. He did not specify what age. However, he also indicated that an individual's training and background are important and that people should be treated on an individual basis. Dr. Welch discussed tests which would screen applicants for certain physical and mental qualities. He stated that he was not aware of any performance tests that had been developed for dispatchers.

None of this evidence was of such strength or probity as to require the Commissioner to find in accordance with it. Her conclusion that the maximum age limit of 36 is not a bona fide occupational requirement is amply supported by the evidence offered by the Bureau and set forth in her findings.

## IV

■■ In its last assignment of error, the District challenges the Commissioner's authority to award damages in this case. The Commissioner, after considering all the evidence, has the authority to issue an appropriate cease and desist order against any respondent found to have engaged in an unlawful employment practice. *Gaudry v. Bureau of Labor & Ind.*, 48 Or App 589, 593, 617 P2d 668

---

[4] The District admits that the maximum age limit for dispatchers is no longer in force.

(1980). A cease and desist order is defined by ORS 659.010(2), which states, in pertinent part, as follows:

"(2)  'Cease and desist order' means an order signed by the commissioner, taking into account the subject matter of the complaint and the need to supervise compliance with the terms of any specific order issued to eliminate the effects of any unlawful practice found, addressed to a respondent requiring the respondent to:

"(a)  Perform an act or series of acts designated therein and reasonably calculated to carry out the purposes of ORS 659.010 to 659.110 and 659.400 to 659.435, eliminate the effects of an unlawful practice found, and protect the rights of the complainant and other persons similarly situated; * * *."

The award of back pay is designed to protect the rights of the private complainants in this case. As such, it is within the scope of Commissioner's authority to order such an award. *See School District No. 1 v. Nilsen, supra,* 271 Or at 461; *Gaudry v. Bureau of Labor & Ind., supra,* 48 Or App at 589.[5]

■     The petitioner claims that under ORS 30.265(c), it is immune from liability for damages because it acted pursuant to rules duly established by its Civil Service Commission. ORS 30.265(c) provides immunity for tortious conduct on the part of a public official where the claim of liability is based upon the performance or the failure to perform a discretionary function or duty. That section is inapplicable to a case of employment discrimination brought pursuant to ORS ch 659. A public employer is not immune from liability for acts of discrimination in screening potential job applicants. It is not entrusted with the discretionary authority to discriminate unlawfully. The Commissioner's award of back pay as damages to the private complainants was proper and within the scope of her authority.

Affirmed.

---

[5] Petitioner does not challenge the evidentiary basis for the award or the method of computation.