Argued and submitted July 29, 1981, affirmed as modified
December 22, 1982, reconsideration denied March 18, petition for review allowed
April 19, 1983 (294 Or 749)
See 67 Or App 729, 680 P2d 16 (1983)

## CIVIL SERVICE BOARD OF THE CITY OF PORTLAND,
*Petitioner,*

*v.*

## BUREAU OF LABOR AND INDUSTRIES,
*Respondent.*

(No. 4-79, CA A20231)

655 P2d 1080

Richard A. Braman, Portland, argued the cause and filed the brief for petitioner.

William F. Nessly, Jr., Assistant Attorney General, Salem, argued the cause for respondent. With him on the

brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Joseph, Chief Judge, and Warden, Judge.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioner, the Civil Service Board of Portland, seeks judicial review of an order of the Commissioner of the Bureau of Labor and Industries (Commissioner) determining that petitioner's removal of the complainant's name from the fire fighter eligibility list for employment by the Portland Fire Bureau because of his age constituted an unlawful employment practice in violation of ORS 659.030.[1] Petitioner assigns numerous errors to the Commissioner's order, but our view of the case requires consideration of only its principal contention that the Commissioner erred in concluding that the maximum hiring age for fire fighters contained in Portland City Charter section 4-106[2] is not a bona fide occupational requirement (BFOR) reasonably necessary to the safe operation of the Fire Bureau's normal operation. Because we conclude that, even if the findings of fact are supported by substantial evidence, the Commissioner erred as a matter of law in concluding that petitioner has not established that the maximum age requirement for fire fighter applicants is a BFOR, we set aside that portion of the Commissioner's order.

On June 27, 1977, Tylan J. Peters, an honorably discharged war veteran, applied for the position of hoseman (fire fighter) with the Fire Bureau. He completed successfully petitioner's written, oral and physical examinations and, on September 28, 1977, was ranked number 47 on petitioner's eligibility list for the Fire Bureau. From that list, the highest ranked applicant is offered the next

---

[1] ORS 659.030(1)(a) prohibits, *inter alia,* an employer from refusing to hire a person because of the person's age.

[2] Portland City Charter, section 4-106, provides:

"All patrolmen shall be between the ages of 21 and 30 years and all hosemen shall be between the ages of 21 and 26 years on the dates of their respective appointments; provided, that in the case of an applicant for either of said positions who, being a citizen of the United States, has honorably served in the armed forces of the United States of America during any war to which the United States was or shall be a party belligerent, the maximum age limit shall be extended to 35 years for a patrolman and to 31 years for a hoseman."

Having made its record here for the maximum hiring age of 32 for a hoseman, petitioner would be hard put to justify the younger age for non-veteran hosemen.

fire fighter opening after passing a routine physical examination.

On December 8, 1977, Peters was notified by petitioner that his name had been removed from the eligibility list on October 13, 1977, his 31st birthday, in compliance with the charter provision. Peters filed an age discrimination complaint with the Civil Rights Division of the Bureau of Labor. After investigation, the Commissioner charged petitioner with the unlawful employment practice that initiated this proceeding. A hearing was held in July, 1979. During that month, we affirmed, without opinion, the trial court judgment in *Kelly v. City of Portland,* 41 Or App 185, 597 P2d 1316, *rev den* 288 Or 1 (1979), which construed the phrase "between the ages of 21 and 26 years" in section 4-106 to mean that applicants were eligible for certification up to their 27th birthday. Consistent with that decision, it was stipulated in this proceeding that Peters would have been certified for appointment prior to his 32nd birthday. Thus, Peters was eligible for a medical examination, which he then passed, thereby becoming certified for appointment. He was appointed on December 21, 1979.

Notwithstanding Peters' appointment, on October 21, 1980, the Commissioner issued a final order concluding that the maximum hiring age here involved (age 32) and prescribed by section 4-106, Portland City Charter, was not a *bona fide* occupational requirement necessary to the normal operation of the Fire Bureau and, therefore, constituted an unlawful employment practice. ORS 659.030. In addition to ordering petitioner to appoint Peters to the next available position on the Fire Bureau, the order directed that Peters be awarded the seniority, compensation and benefit levels which he would have attained had he not been removed from the eligibility list because of his age. On January 23, 1981, the Commissioner issued an "addendum order" and, in addition to the benefits set forth in her original order, granted Peters retroactive pay and accrued vacation and sick leave from June 21, 1978, the date Peters would have been appointed had his name not been removed from the eligibility list.[3] That order also directed petitioner

---

[3] This proceeding involves only the maximum hiring age of 32 years for a hoseman. It is not contended that the case is moot because Peters was appointed

to ensure that no future applicant be disqualified solely because of his or her age.

ORS 659.030 provides, in pertinent part:

"(1)  * * * [I]t is an unlawful employment practice:

"(a)  For an employer, because of an individual's * * * age if the individual is 18 years of age or older and under 65 years of age, * * * to refuse to hire or employ or to bar or discharge from employment such individual * * *. However, *discrimination is not an unlawful employment practice if such discrimination results from a bona fide occupational requirement reasonably necessary to the normal operation of the employer's business.* (Emphasis supplied.)

It is undisputed that applicants, including Peters, are removed from petitioner's eligibility list solely because of age. That fact is sufficient to make a *prima facie* case of discrimination. As a result, petitioner has the burden of proving by a preponderance of the evidence that the maximum hiring age requirement is a *bona fide* occupational requirement necessary to the Fire Bureau's normal operation. *School District No. 1 v. Nilsen,* 271 Or 461, 483, 534 P2d 1135 (1975); *Clackamas Co. Fire Protection v. Bureau of Labor,* 50 Or App 337, 349, 624 P2d 141, *rev den* 291 Or 9 (1981).

■     What the employer must show in age discrimination cases is more problematical where public safety is involved. Only one Oregon case has dealt with that problem. In *Clackamas Co. Fire Protection v. Bureau of Labor, supra,* we affirmed the Commissioner's conclusion that a

---

prior to the Commissioner's order, even though some portions of the order may be surplusage. The retroactive rights to which Peters was entitled were set forth in the order and subsequent addendum. Further, the Bureau of Labor and Industries is authorized by ORS 659.100 to eliminate and prevent discrimination in employment because of age (among other causes); the Commissioner is directed to carry into effect that power and, in doing so, is authorized to issue subpoenas to require production of evidence necessary for the performance of that duty. The Commissioner could have conducted an inquiry into the validity of the age requirement here and could have made a determination on that question, without regard to the formal complaint which initiated this proceeding. Here, she continued the proceedings to determine the validity of the employment practice embodied in the Portland City Charter that triggered the complaint. The Commissioner signed a stipulated preliminary order listing other applicants "similarly situated" who were removed from the eligibility list because of age; the order provided that those persons be certified by petitioner in the order listed. We agree that the case is not moot; the employment *practice* in the context in which it was raised and decided is all that we consider.

maximum age limit for the employment of dispatchers of the fire district was not a bona fide occupational requirement. Although there was a small public safety factor involved in that case, the evidence was insufficient to show any correlation between the age of the applicant and the applicant's ability to perform a dispatcher's job; in fact, some of the expert witnesses testified that maturity and stability that comes with age might be a positive factor in a person's ability to perform that job. There, the Commissioner relied on federal decisions applying similar language under the Federal Age Discrimination Employment Act of 1967. Although we discussed some of those cases and noted that they did not appear to be completely harmonious, we had no occasion to decide what the test should be, because we agreed that petitioner had failed to sustain its burden under any of them.

Here the Commissioner stated the test to be that set forth in *Usery v. Tamiami Trail Tours, Inc.*, 531 F2d 224 (5th Cir 1976), which was decided after that Court's decisions in *Weeks v. Southern Bell Telephone & Telegraph Company*, 408 F2d 228 (5th Cir 1969), and *Diaz v. Pan Am World Airways, Inc.*, 442 F2d 385 (5th Cir 1971), *cert den* 404 US 950 (1971), and after the Seventh Circuit's decision in *Hodgson v. Greyhound Lines, Inc.*, 499 F2d 859 (7th Cir 1974), *cert den* 419 US 1122 (1975). Both *Weeks* and *Diaz* were sex discrimination cases. In *Weeks*, the court said the test for the BFOR defense was that the employer must prove that:

> "* * * He had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." 408 F2d at 235.

*Diaz* invalidated the employer's policy of refusing to hire males as airline cabin attendants. The court limited the BFOR defense to those cases in which "the essence of the business operation would be undermined by not hiring members of one sex exclusively." 442 F2d at 388. The court held that, because the primary function of an airline is to transport passengers safely from one point to another, the employer did not carry its burden under the BFOR defense, even though most males may not be able to perform adequately the nonmechanical functions of a cabin attendant:

that inability would not undermine the safe transportation of passengers.

In the *Greyhound* case, the Seventh Circuit was confronted squarely with an employment practice directly related to public safety: the hiring of inter-city bus drivers. The court reviewed the *Weeks'* decision and its propriety as applied to a sex discrimination case, but concluded that its application was inappropriate in the case before it, because:

> "Unlike *Weeks,* our concern goes beyond that of the welfare of the job applicant and must include consideration of the well-being and safety of bus passengers and other highway motorists." 499 F2d at 861.

The court went on to consider the test applied in *Diaz* as requiring a business *necessity* for the discriminatory practice, and adopted it as a first step in determining whether the BFOR defense was applicable to Greyhound. The court required that Greyhound establish that the essence of its operations would be endangered by hiring drivers over the specified age. It concluded that Greyhound had established that fact and, having done so, it was not necessary for Greyhound to fulfill the *Weeks* test. It stated:

> "Rather, to the extent that the elimination of Greyhound's hiring policy may impede the attainment of its goal of safety, it must be said that such action undermines the essence of Greyhound's operations. Stated differently, Greyhound must demonstrate that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers. Greyhound need only demonstrate however a minimal increase in risk of harm for it is enough to show that elimination of the hiring policy might jeopardize the life of one more person than might otherwise occur under the present hiring practice." 499 F2d at 863.

Then came *Tamiami.* The Fifth Circuit in *Tamiami* explained that it was not necessary for the Seventh Circuit to reject *Weeks* in the *Greyhound* case, because a synthesis of the Fifth Circuit's decisions in *Weeks* and *Diaz* results in a test applicable to employment practices that involve public safety. *Diaz,* the court said, took care of the safety factor:

"The greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." 531 F2d at 236.

Because Tamiami had established the public safety factor as being an essential element of its business, the court said it would apply the test in *Weeks,* which it stated to be:

"Whether it [the employer] had reasonable cause, that is, a factual basis, for believing that all or substantially all persons over 40 would be unable to perform safely and efficiently the duties of the job involved, or whether it is impossible or impractical to deal with persons over 40 on an individualized basis." 531 F2d 236.

The court explained that although Tamiami made no effort to establish a factual basis for believing that substantially all job applicants over the maximum hiring age would be unable to drive buses safely, the record supported the finding under the second prong of its test: it was impracticable to accurately separate chronological from functional or physiological age. The court went on to say:

"We emphasize safety in busing just as we would in a variety of other industrial areas where safety to fellow employees is of such humane importance that the *employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life* and limb. The employer must of course *show a reasonable basis for its assessment of risk of injury/ death.* But it cannot be expected to establish this to a certainty, for certainty would require running the risk until a tragic accident would prove that the judgment was sound. Priceless as is a single life in our concept of the value of human life and our undoubted unwillingness ever to approve a practice which might kill one but not, say, twenty, we think *the safety factor should be evaluated in terms of the possibility or likelihood of injury/death."* 531 F2d at 238. (Emphasis supplied.)

The latest case of which we are aware is *Murnane v. American Airlines, Inc.,* 667 F2d 98 (D.C. Cir 1981), where the court upheld the airlines' refusal to hire persons over 40 as flight officers. There, in addition to emphasizing the public safety factor, the court held that the employment practice was a bona fide occupational qualification, because

the position of flight officer was the first step in a ten to fifteen year program of progress from flight officer to co-pilot to captain, and that if a person were hired as flight officer in his forties he probably would not become a captain until his late fifties. Because the Federal Aviation Administration requires retirement at age 60, the applicant would be able to serve only briefly as a captain before he had to retire. By limiting its hiring to relatively young pilots, American insured that the experience of its captains would be maximized, thereby also maximizing safety.

The Commissioner here purported to apply what she considered to be the test adopted in *Tamiami,* the principal part of which is: whether it is impossible or impractical to deal with persons over 40 on an individualized basis. It appears to us that, although the court in *Tamiami* used that language, the test does not end there when there is a substantial public safety factor. The court, albeit circuitously, ended up with a test substantially the same as that used by the Seventh Circuit in *Greyhound,* but it characterized the test as its *"Weeks-Diaz"* test. As we understand the ultimate test adopted in *Tamiami* to be applied when there is a substantial public safety factor involved, the employer may sustain its BFOR defense by showing "a reasonable basis for its assessment" that "the possibility or likelihood of injury/death" would increase if it eliminated its maximum hiring age; in making that assessment, it "should err on the side of preservation of life and limb." That is essentially the test applied by the Court of Appeals for the District of Columbia in *Murnane v. American Airlines, Inc., supra,*[4] and we believe it is the test

---

[4] In *Murnane v. American Airlines, Inc., supra,* after pointing out the substantial safety factor in the airline business, the court said:

"* * * Therefore, in our judgment, the airline industry must be accorded great leeway and discretion in determining the manner in which it may be operated most safely, *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 236 n.30 (5th Cir. 1976). This is in accord with American's view that 'safe' is not sufficient. Rather, the 'safest' possible air transportation is the ultimate goal. Courts, in our view, do not possess the expertise with which, in a cause presenting safety as the critical element, to supplant their judgments for those of the employer." 667 F.2d at 101.

It is at least interesting that all of the cited cases *(Tamiami, Greyhound and Murnane)* involving maximum hiring age limits where substantial public safety is involved have upheld the age requirement.

applicable here. With that conclusion in mind, we turn to the record.

## EFFECTS OF FIREFIGHTING

The uncontradicted evidence is that fire fighting is an exceptionally arduous and hazardous occupation. In fact, more job-related injuries and deaths occur in fire fighting than in any other occupation. The high incidence of injuries and death in fire fighting is attributable to the extremes which fire fighters must endure. At one moment the fire fighter may be resting comfortably at the station house; the next moment the alarm sounds, and the fire fighter must dress quickly in "turn-out" gear, get out the door and on the "rig" within 30 seconds. The abrupt change from a sedantary position to an active one causes a fire fighter's heartbeat to jump from a sleeping pulse of around 60 to 70 beats per minute up to 160 beats per minute. That elevated heart rate is sustained for extended periods during the fire fighter's duties at the scene of the fire and places considerable strain on the cardiovascular system.

At the scene of a fire, fire fighters routinely encounter extreme heat, severe enough to cause plastics and glass to melt and to raise their own body temperatures to 105 degrees. Added to the heat of the fire, fire fighters must work in "turn-out" clothing consisting of boots, helmet and masks, which prevent elimination of body moisture and the extra heat the body absorbs at the fire. The "turn-out" clothing plus the breathing apparatus, harness and belts that a fire fighter must wear add an extra 50 pounds he must carry while performing his specific duties or "evolutions" at the fire. The fire fighter's work is further impeded by the water hoses, which must be pulled and positioned properly, weighing approximately 40 pounds and carrying back-pressure of 80 to 100 pounds. Those factors combine to impair his freedom of movement during the fire operation and to effect adversely the heart and musculoskeletal system.

A fire fighter regularly encounters noxious fumes at a fire, including carbon monoxide, which prevents the blood from carrying oxygen to the body. The carbon monoxide level in a fire fighter is commonly elevated after a fire. Cyanide gas is often present and further impedes the flow

of oxygen to the tissues of the body. All of those noxious fumes have an adverse effect on the cardiopulmonary system.

## THE PORTLAND FIRE BUREAU

The Fire Bureau has 26 engine companies (the engine carries hoses and pumps) and ten truck companies (the truck carries equipment such as ladders, entry and salvage tools). Each company consists of a fire lieutenant and from three to five fire fighters. Fire fighters are on duty for 24 hours, then off duty for 48 hours. The fire lieutenant assigns specific "evolutions" to be performed by each fire fighter at the fire and controls the operation at the scene. In this manner, the fire company operates as a team. If one member becomes disabled at a fire, the operation stops while attention is diverted to assisting the injured member. Once the member has received proper care, the company resumes its fire fighting operation.

The average age of a fire fighter at the Fire Bureau is 36; that of a fire lieutenant is 43. Both of those positions are directly involved in entering and fighting a fire. Older members of a fire company are commonly assigned to drive and operate the pump (in an engine company) or to drive and operate the hydraulic equipment (in a truck company). Persons in those positions do not enter the fire. The remaining positions in the Fire Bureau are noncombatant and promotional; persons holding those positions range in average age from 44 to 52. Mandatory retirement from the Fire Bureau is 64.

## EFFECTS OF AGING ON FIREFIGHTERS

The older members of the fire companies experience a proportionately greater number of serious, long-time injuries, such as strains and sprains to the body, than do the younger members. By contrast, the younger members suffer a proportionately greater number of short-term injuries, such as cuts, punctures and burns, because of their lack of experience. Fire fighters in their middle thirties incur the fewest job-related injuries. After a fire fighter has gained sufficient experience and training on the job, fewer injuries occur, as evidenced by the small number of injuries incurred by fire fighters in the middle age bracket. Commencing at about age 40, the on-the-job experience and

training gained by the fire fighter are not sufficient to overcome the encroachment of age. The hazards encountered in their daily occupation are more likely to result in serious injuries, including permament heart disabilities. In the Fire Bureau, no heart disabilities have been suffered by fire fighters under the age of 40.

## FIRE BUREAU'S PROGRAM

The program instituted by the Fire Bureau seeks to achieve the optimum level of efficient fire fighting, consistent with public safety for the longest period of time. According to petitioner, maximum age limits were established, as well as rigorous pre-entry examinations, in an effort to assure a fire fighter's ability to cope with the strenuous duties for a maximum length of time after being appointed. In 1977, the Fire Bureau adopted a program requiring annual physical examinations of all fire fighters. The examination tests fat content, blood pressure, heart rate and stress, but it cannot accurately predict a fire fighter's ability to perform his duties at the scene of a fire at any given date, but only the fire fighter's physical condition at the time of the examination.

The evidence is undisputed that, after entering the Fire Bureau program, it takes approximately eight to nine years for a fire fighter to reach optimum proficiency at his job, that is, providing maximum service in fire suppression and public safety, while incurring the least number of injuries. However, once a fire fighter reaches the age of 40, the aging process produces a negative effect on his performance, as evidenced by the increased number of serious long-term injuries incurred by older members. Accordingly, in order for the Fire Bureau to obtain at least one year of peak performance from a fire fighter (gained after eight to nine years of on-the-job training) and, thus, the greatest public safety, it must hire applicants before their 32nd birthday.

## THE COMMISSIONER'S ORDER

The order on review is divided into findings of fact, ultimate findings of fact, conclusions of law and opinion. Although petitioner challenges some of the findings[5] as not

---

[5] Petitioner challenges the following findings:

"15) Degenerative physical changes due to aging do not often begin as early as 31 or 32 years of age.

being supported by reliable, credible and substantial evidence, the gist of them, as well as the ultimate findings,[6] conclusions and opinion of the Commissioner, in our opinion, miss the mark.

---

"16) Chronological age alone is a crude measure of the physical condition of a particular individual, as the aging process varies from individual to individual.

"17) Functional age or some other individualized measure is more accurate than chronological age alone in measuring physical condition.

"18) A thorough, rigorous, regularly-conducted physical examination would be an adequate method of determining functional age for purposes of measuring physical condition to separate those physically qualified from those physically unqualified for the job of Fire Fighter.

"19) It would have cost approximately three-tenths of one percent of the 1979 Fire Bureau budget to conduct such physical examinations on every Portland Fire Bureau Fire Fighter in 1979. It would have cost six one-hundredths of one percent of the 1979 Fire Bureau budget to conduct such examinations in 1979 on the one hundred persons considered and available for Fire Fighter appointment from the 1977 Fire Fighter Eligible List.

"20) The job of Fire Fighter involves a team as opposed to individual effort. The risk that one person's error or physical defect would produce tragic results, including those which could imperil public safety, is far less in a joint effort than in an individual effort, because no one person bears the responsibility for the entire effort.

We note, without discussion, that there is no reliable, credible and substantial evidence, *Clackamas Co. Fire Protection v. Bureau of Labor, supra,* to support finding 18 (that a regularly conducted physical examination would be an adequate method of determining functional age), if that finding is intended to mean that such a determination would fulfill the Fire Bureau's program requirements. Neither is there such evidence to support finding 20; the evidence is that if a member of the team is hurt, the others go to his aid, leaving the team out of the fire fighting for the time it takes to take care of the fallen member.

[6] The challenged ultimate findings are:

"5) although there is a general direct relationship between advancing chronological age and deteriorating physical condition, chronological age alone is but a crude measure of the physical condition of a particular individual.

"6) There is no factual basis for believing that all or substantially all individuals who have passed their 31st or 32nd birthday would be unable to perform the job of Fire Fighter safely and efficiently.

"7) Screening Fire Fighter applicants on an individualized basis to differentiate between physically qualified and unqualified applicants is not impossible. In fact, the degenerative effects of the aging process in a particular individual would be better detected by individual screening through, for example, a thorough, rigorous, regularly-conducted physical examination than by mere consideration of chronological age.

"8) Screening Fire Fighter applicants on an individualized basis to differentiate between the physically qualified and unqualified applicants is not highly impractical.

The findings recognize that public safety is a major factor in the conduct of the business of the Fire Bureau in providing fire protection, that fire fighting is an extremely arduous occupation requiring above average physical capabilities and that fire fighters should be in top physical condition. They also recognize that there is a general direct relationship between advancing chronological age and deteriorating physical condition and the related incidents of disabling injuries among fire fighters. However, the findings on which the Commissioner relies relate to the proposition that top physical condition often postpones degenerative physical changes resulting from the aging process, and that any person's physical condition can be determined at any given time by a thorough physical examination. Given that premise, the Commissioner concluded that the Fire Bureau had failed to establish the impossibility or great impracticality of differentiating the qualified from the unqualified by individual screening.

As one might expect, there is evidence to support the proposition that the physical condition of a person of any age may be determined by a thorough physical examination, and that a person's chronological age does not determine his physical condition. However, the evidence is that degenerative processes are difficult to observe. There is no evidence that a physical examination can do more than determine the person's physical condition at the time the examination is given, and the Commissioner did not find to the contrary. Even though such examinations may be given regularly to determine the person's ability at that time to engage in fire fighting, that process does not aid the Fire Bureau in carrying out its program designed to achieve maximum performance of a fire fighter for the greatest length of time before the degenerative processes of aging overcome the fire fighter's years of experience. The purpose is to maximize public safety, the safety of fellow fire fighters who must depend on each other, as well as to get the most out of the projected career-span of a fire fighter.

The Commissioner attempted to apply what we view as an abbreviated *Tamiami* test and did so mechanically, without considering the Fire Bureau's reasonable basis for its assessment that the possibility or likelihood of

injury or death would increase if it eliminated its maximum hiring age, and also ignored the admonition of the *Tamiami* court that an employer, in making that assessment, should err on the side of preservation of life and limb. This record clearly supports the reasonableness of the Fire Bureau's assessment of the risks of eliminating the maximum hiring age.

This case is substantially similar to *Murnane v. American Airlines, Inc., supra.* There the court sustained the airlines' maximum hiring age of 40 for flight officers where the airlines' program involved a ten to fifteen year progression from flight officer to co-pilot to captain. By limiting its hiring to relatively young pilots, the airline insured that the experience of its captains would be maximized, thereby maximizing safety.

Because we conclude that the Commissioner erroneously interpreted the applicable law and that a correct interpretation compels the conclusion that petitioner's BFOR defense should be sustained, we set aside that portion of the order determining that Portland City Charter, section 4-106, insofar as it prescribes the maximum hiring age of 32 for hosemen, violates ORS 659.030(1)(a). ORS 183.482(8)(a)(A); as so modified, the order is affirmed.